*401 Justice Alito
delivered the opinion of the Court.
Section 702 of the Foreign Intelligence Surveillance Act of 1978, 50 U. S. C. § 1881a (2006 ed., Supp. V), allows the Attorney General and the Director of National Intelligence to acquire foreign intelligence information by jointly authorizing the surveillance of individuals who are not “United States persons”[1] and are reasonably believed to be located outside the United States. Before doing so, the Attorney General and the Director of National Intelligence normally must obtain the Foreign Intelligence Surveillance Court’s approval. Respondents are United States persons whose work, they allege, requires them to engage in sensitive international communications with individuals who they believe are likely targets of surveillance under § 1881a. Respondents seek a declaration that § 1881a is unconstitutional, as well as an injunction against § 1881a-authorized surveillance. The question before us is whether respondents have Article III standing to seek this prospective relief.
Respondents assert that they can establish injury in fact because there is an objectively reasonable likelihood that their communications will be acquired under § 1881a at some point in the future. But respondents’ theory of future injury is too speculative to satisfy the well-established requirement that threatened injury must be “certainly impending.” E. g., Whitmore v. Arkansas, 495 U. S. 149, 158 (1990). And even if respondents could demonstrate that the threatened injury is certainly impending, they still would not be able *402 to establish that this injury is fairly traceable to § 1881a. As an alternative argument, respondents contend that they are suffering present injury because the risk of § 1881a-authorized surveillance already has forced them to take costly and burdensome measures to protect the confidentiality of their international communications. But respondents cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending. We therefore hold that respondents lack Article III standing.
I
A
In 1978, after years of debate, Congress enacted the Foreign Intelligence Surveillance Act (FISA) to authorize and regulate certain governmental electronic surveillance of communications for foreign intelligence purposes. See 92 Stat. 1783, 50 U. S. C. § 1801 et seq.; 1 D. Kris & J. Wilson, National Security Investigations & Prosecutions §§3.1, 3.7 (2d ed. 2012) (hereinafter Kris & Wilson). In enacting FISA, Congress legislated against the backdrop of our decision in United States v. United States Dist. Court for Eastern Dist. of Mich., 407 U. S. 297 (1972) (Keith), in which we explained that the standards and procedures that law enforcement officials must follow when conducting “surveillance of ‘ordinary crime’ ” might not be required in the context of surveillance conducted for domestic national-security purposes. Id., at 322-323. Although the Keith opinion expressly disclaimed any ruling “on the scope of the President’s surveillance power with respect to the activities of foreign powers,” id., at 308, it implicitly suggested that a special framework for foreign intelligence surveillance might be constitutionally permissible, see id., at 322-323.
In constructing such a framework for foreign intelligence surveillance, Congress created two specialized courts. In FISA, Congress authorized judges of the Foreign Intelli *403 gence Surveillance Court (FISC) to approve electronic surveillance for foreign intelligence purposes if there is probable cause to believe that “the target of the electronic surveillance is a foreign power or an agent of a foreign power,” and that each of the specific “facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power.” § 105(a)(3), 92 Stat. 1790; see §§ 105(b)(1)(A), (b)(1)(B), ibid.; 1 Kris & Wilson §7:2, at 194-195; id., § 16:2, at 528-529. Additionally, Congress vested the Foreign Intelligence Surveillance Court of Review with jurisdiction to review any denials by the FISC of applications for electronic surveillance. § 103(b), 92 Stat. 1788; 1 Kris & Wilson §5:7, at 151-153.
In the wake of the September 11th attacks, President George W. Bush authorized the National Security Agency (NSA) to conduct warrantless wiretapping of telephone and e-mail communications where one party to the communication was located outside the United States and a participant in “the call was reasonably believed to be a member or agent of al Qaeda or an affiliated terrorist organization,” App. to Pet. for Cert. 403a. See id., at 263a-265a, 268a, 273a-279a, 292a-293a; American Civil Liberties Union v. NSA, 493 F. 3d 644, 648 (CA6 2007) (ACLU) (opinion of Batchelder, J.). In January 2007, the FISC issued orders authorizing the Government to target international communications into or out of the United States where there was probable cause to believe that one participant to the communication was a member or agent of al Qaeda or an associated terrorist organization. App. to Pet. for Cert. 3Í2a, 398a, 405a. These FISC orders subjected any electronic surveillance that was then occurring under the NSA’s program to the approval of the FISC. Id., at 405a; see id., at 312a, 404a. After a FISC Judge subsequently narrowed the FISC’s authorization of such surveillance, however, the Executive asked Congress to amend FISA so that it would provide the intelligence community with additional authority to meet the challenges *404 of modern technology and international terrorism. Id., at 315a-318a, 331a-333a, 398a; see id., at 262a, 277a-279a, 287a.
When Congress enacted the FISA Amendments Act of 2008 (FISA Amendments Act), 122 Stat. 2436, it left much of FISA intact, but it “established a new and independent source of intelligence collection authority, beyond that granted in traditional FISA.” 1 Kris & Wilson §9:11, at 349-360. As relevant here, § 702 of FISA, 50 U. S. C. § 1881a (2006 ed., Supp. V), which was enacted as part of the FISA Amendments Act, supplements pre-existing FISA authority by creating a new framework under which the Government may seek the FISC’s authorization of certain foreign intelligence surveillance targeting the communications of non-U. S. persons located abroad. Unlike traditional FISA surveillance, § 1881a does not require the Government to demonstrate probable cause that the target of the electronic surveillance is a foreign power or agent of a foreign power. Compare §§ 1805(a)(2)(A), (a)(2)(B), with §§ 1881a(d)(l), (i)(3)(A); 638 F. 3d 118, 126 (CA2 2011); 1 Kris & Wilson § 16:16, at 584. And, unlike traditional FISA, § 1881a does not require the Government to specify the nature and location of each of the particular facilities or places at which the electronic surveillance will occur. Compare §§ 1805(a)(2)(B), (c)(1) (2006 ed. and Supp. V) with §§ 1881a(d)(l), (g)(4), (i)(3)(A); 638 F. 3d, at 125-126; 1 Kris & Wilson §16:16, at 585.[2]
The present case involves a constitutional challenge to § 1881a. Surveillance under § 1881a is subject to statutory conditions, judicial authorization, congressional supervision, and compliance with the Fourth Amendment. Section 1881a provides that, upon the issuance of an order from the FISC, “the Attorney General and the Director of National Intelligence may authorize jointly, for a period of up to 1 year ..., the targeting of persons reasonably believed to be located *405 outside the United States to acquire foreign intelligence information.” § 1881a(a). Surveillance under § 1881a may not be intentionally targeted at any person known to be in the United States or any U. S. person reasonably believed to be located abroad. §§ 1881a(b)(l)-(3); see also §1801(i). Additionally, acquisitions under § 1881a must comport with the Fourth Amendment. § 1881a(b)(5). Moreover, surveillance under § 1881a is subject to congressional oversight and several types of Executive Branch review. See § § 1881a(f )(2), (0; Amnesty Int’l USA v. McConnell, 646 F. Supp. 2d 633, 640-641 (SDNY 2009).
Section 1881a mandates that the Government obtain the FISC’s approval of “targeting” procedures, “minimization” procedures, and a governmental certification regarding proposed surveillance. §§ 1881a(a), (c)(1), (i)(2), (i)(3). Among other things, the Government’s certification must attest that (1) procedures are in place “that have been approved, have been submitted for approval, or will be submitted with the certification for approval by the [FISC] that are reasonably designed” to ensure that an acquisition is “limited to targeting persons reasonably believed to be located outside” the United States; (2) minimization procedures adequately restrict the acquisition, retention, and dissemination of nonpublic information about unconsenting U. S. persons, as appropriate; (3) guidelines have been adopted to ensure compliance with targeting limits and the Fourth Amendment; and (4) the procedures and guidelines referred to above comport with the Fourth Amendment. § 1881a(g)(2); see § 1801(h).
The FISC’s role includes determining whether the Government’s certification contains the required elements. Additionally, the court assesses whether the targeting procedures are “reasonably designed” (1) to “ensure that an acquisition ... is limited to targeting persons reasonably believed to be located outside the United States” and (2) to “prevent the intentional acquisition of any communication as *406 to which the sender and all intended recipients are known . . . to be located in the United States.” § 1881a(i)(2)(B). The court analyzes whether the minimization procedures “meet the definition of minimization procedures under section 1801(h) . . . , as appropriate.” § 1881a(i)(2)(C). The court also assesses whether the targeting and minimization procedures are consistent with the statute and the Fourth Amendment. See § 1881a(i)(3)(A).[3]
B
Respondents are attorneys and human rights, labor, legal, and media organizations whose work allegedly requires them to engage in sensitive and sometimes privileged telephone and e-mail communications with colleagues, clients, sources, and other individuals located abroad. Respondents believe that some of the people with whom they exchange foreign intelligence information are likely targets of surveillance under § 1881a. Specifically, respondents claim that they communicate by telephone and e-mail with people the Government “believes or believed to be associated with terrorist organizations,” “people located in geographic areas that are a special focus” of the Government’s counterterrorism or diplomatic efforts, and activists who oppose governments that are supported by the United States Government. App. to Pet. for Cert. 399a.
Respondents claim that § 1881a compromises their ability to locate witnesses, cultivate sources, obtain information, and communicate confidential information to their clients. Respondents also assert that they “have ceased engaging” in certain telephone and e-mail conversations. Id., at 400a. *407 According to respondents, the threat of surveillance will compel them to travel abroad in order to have in-person conversations. In addition, respondents declare that they have undertaken “costly and burdensome measures” to protect the confidentiality of sensitive communications. Ibid.
C
On the day when the FISA Amendments Act was enacted, respondents filed this action seeking (1) a declaration that § 1881a, on its face, violates the Fourth Amendment, the First Amendment, Article III, and separation-of-powers principles and (2) a permanent injunction against the use of § 1881a. Respondents assért what they characterize as two separate theories of Article III standing. First, they claim that there is an objectively reasonable likelihood that their communications will be acquired under § 1881a at some point in the future, thus causing them injury. Second, respondents maintain that the risk of surveillance under § 1881a is so substantial that they have been forced to take costly and burdensome measures to protect the confidentiality of their international communications; in their view, the costs they have incurred constitute present injury that is fairly traceable to § 1881a.
After both parties moved for summary judgment, the District Court held that respondents do not have standing. 646 F. Supp. 2d, at 636. On appeal, however, a panel of the Second Circuit reversed. The panel agreed with respondents’ argument that they have standing due to the objectively reasonable likelihood that their communications will be intercepted at some time in the future. 638 F. 3d, at 133, 134, 139. In addition, the panel held that respondents have established that they are suffering “present injuries in fact— economic and professional harms—stemming from a reasonable fear of future harmful government conduct.” Id., at 138. The Second Circuit denied rehearing en banc by an equally divided vote. 667 F. 3d 163 (2011).
*408 Because of the importance of the issue and the novel view of standing adopted by the Court of Appeals, we granted certiorari, 566 U. S. 1009 (2012), and we now
II
Article III of the Constitution limits federal courts’ jurisdiction to certain “Cases” and “Controversies.” As we have explained, “[n]o principle is more fundamental to the judiciary’s proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.” DaimlerChrysler Corp. v. Cuno, 547 U. S. 332, 341 (2006) (internal quotation marks omitted); Raines v. Byrd, 521 U. S. 811, 818 (1997) (internal quotation marks omitted); see, e. g., Summers v. Earth Island Institute, 555 U. S. 488, 492-493 (2009). “One element of the case-or-eontroversy requirement” is that plaintiffs “must establish that they have standing to sue.” Raines, supra, at 818; see also Summers, supra, at 492-493; DaimlerChrysler Corp., supra, at 342; Lujan v. Defenders of Wildlife, 504 U. S. 555, 560 (1992).
The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches. Summers, supra, at 492-493; Daimler-Chrysler Corp., supra, at 341-342, 353; Raines, supra, at 818-820; Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U. S. 464, 471-474 (1982); Schlesinger v. Reservists Comm. to Stop the War, 418 U. S. 208, 221-222 (1974). In keeping with the purpose of this doctrine, “our standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.” Raines, supra, at 819-820; see Valley Forge Christian College, supra, at 473-474; Schlesinger, supra, at 221-222. “Relaxation of standing re *409 quirements is directly related to the expansion of judicial power,” United States v. Richardson, 418 U. S. 166, 188 (1974) (Powell, J., concurring); see also Summers, supra, at 492-493; Schlesinger, supra, at 222, and we have often found a lack of standing in cases in which the Judiciary has been requested to review actions of the political branches in the fields of intelligence gathering and foreign affairs, see, e. g., Richardson, supra, at 167-170 (plaintiff lacked standing to challenge the constitutionality of a statute permitting the Central Intelligence Agency to account for its expenditures solely on the certificate of the CIA Director); Schlesinger, supra, at 209-211 (plaintiffs lacked standing to challenge the Armed Forces Reserve membership of Members of Congress); Laird v. Tatum, 408 U. S. 1, 11-16 (1972) (plaintiffs lacked standing to challenge an Army intelligence-gathering program).
To establish Article III standing, an injury must be “concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.” Monsanto Co. v. Geertson Seed Farms, 561 U. S. 139, 149 (2010); see also Summers, supra, at 493; Defenders of Wildlife, 504 U. S., at 560-561. “Although imminence is coneededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending.” Id., at 565, n. 2 (internal quotation marks omitted). Thus, we have repeatedly reiterated that “threatened injury must be certainly impending to constitute injury in fact,” and that “[allegations of possible future injury” are not sufficient. Whitmore, 495 U. S., at 158 (emphasis added; internal quotation marks omitted); see also Defenders of Wildlife, supra, at 565, n. 2, 567, n. 3; see Daimler Chrysler Corp., supra, at 345; Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U. S. 167, 190 (2000); Babbitt v. Farm Workers, 442 U. S. 289, 298 (1979).
*410 i—I 1—I H-4
A
Respondents assert that they can establish injury in fact that is fairly traceable to § 1881a because there is an objectively reasonable likelihood that their communications with their foreign contacts will be intercepted under § 1881a at some point in the future. This argument fails. As an initial matter, the Second Circuit’s “objectively reasonable likelihood” standard is inconsistent with our requirement that “threatened injury must be certainly impending to constitute injury in fact.” Whitmore, supra, at 158 (internal quotation marks omitted); see also Daimler Chrysler Corp., supra, at 345; Laidlaw, supra, at 190; Defenders of Wildlife, supra, at 565, n. 2; Babbitt, supra, at 298. Furthermore, respondents’ argument rests on their highly speculative fear that: (1) the Government will decide to target the communications of non-U. S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the FISC will conclude that the Government’s proposed surveillance procedures satisfy § 188 la’s many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents’ contacts; and (5) respondents will be parties to the particular communications that the Government intercepts. As discussed below, respondents’ theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending. See Summers, supra, at 496 (rejecting a standing theory premised on a speculative chain of possibilities); Whitmore, supra, at 157-160 (same). Moreover, even if respondents could demonstrate injury in fact, the second link in the above-described chain of contingencies—which amounts to mere speculation about whether surveillance *411 would be under § 1881a or some other authority—shows that respondents cannot satisfy the requirement that any injury in fact must be fairly traceable to § 1881a.
First, it is speculative whether the Government will imminently target communications to which respondents are parties. Section 1881a expressly provides that respondents, who are U. S. persons, cannot be targeted for surveillance under § 1881a. See §§ 1881a(b)(1)-(3); 667 F. 3d, at 173 (Raggi, J., dissenting from denial of rehearing en banc). Accordingly, it is no surprise that respondents fail to offer any evidence that their communications have been monitored under § 1881a, a failure that substantially undermines their standing theory. See ACLU, 493 F. 3d, at 655-656, 673-674 (opinion of Batchelder, J.) (concluding that plaintiffs who lacked evidence that their communications had been intercepted did not have standing to challenge alleged NS A surveillance). Indeed, respondents do not even allege that the Government has sought the FISC’s approval for surveillance of their communications. Accordingly, respondents’ theory necessarily rests on their assertion that the Government will target other individuals—namely, their foreign contacts.
Yet respondents have no actual knowledge of the Government’s § 1881a targeting practices. Instead, respondents merely speculate and make assumptions about whether their communications with their foreign contacts will be acquired under § 1881a. See 667 F. 3d, at 185-187 (opinion of Raggi, J.). For example, journalist Christopher Hedges states: “I have no choice but to assume that any of my international communications may be subject to government surveillance, and I have to make decisions ... in light of that assumption.” App. to Pet. for Cert. 366a (emphasis added and deleted). Similarly, attorney Scott McKay asserts that, “[bjecause of the [FISA Amendments Act], we now have to assume that every one of our international communications may be monitored by the government.” Id., at 375a (emphasis added); see also id., at 337a, 343a-344a, 350a, 356a. “The party in- *412 yoking federal jurisdiction bears the burden of establishing” standing—and, at the summary judgment stage, such a party “can no longer rest on . . . ‘mere allegations,’ but must ‘set forth’ by affidavit or other evidence ‘specific facts.’” Defenders of Wildlife, 504 U. S., at 561. Respondents, however, have set forth no specific facts demonstrating that the communications of their foreign contacts will be targeted. Moreover, because § 1881a at most authorizes—but does not mandate or direct—the surveillance that respondents fear, respondents’ allegations are necessarily conjectural. See United Presbyterian Church in U. S. A. v. Reagan, 738 F. 2d 1375, 1380 (CADC 1984) (Scalia, J.); 667 F. 3d, at 187 (opinion of Raggi, J.). Simply put, respondents can only speculate as to how the Attorney General and the Director of National Intelligence will exercise their discretion in determining which communications to target.[4]
Second, even if respondents could demonstrate that the targeting of their foreign contacts is imminent, respondents can only speculate as to whether the Government will seek to use § 1881a-authorized surveillance (rather than other methods) to do so. The Government has numerous other *413 methods of conducting surveillance, none of which is challenged here. Even after the enactment of the FISA Amendments Act, for example, the Government may still conduct electronic surveillance of persons abroad under the older provisions óf FISA so long as it satisfies the applicable requirements, including a demonstration of probable cause to believe that the person is a foreign power or agent of a foreign power. See § 1805. The Government may also obtain information from the intelligence services of foreign nations. Brief for Petitioners 33. And, although we do not reach the question, the Government contends that it can conduct FISA-exempt human and technical surveillance programs that are governed by Executive Order 12333. See Exec. Order No. 12333, §§ 1.4, 2.1-2.5, 3 CFR 202, 210-212 (1981), reprinted as amended, note following 50 U. S. C. §401, pp. 543, 547-548. Even if respondents could demonstrate that their foreign contacts will imminently be targeted— indeed, even if they could show that interception of their own communications will imminently occur—they would still need to show that their injury is fairly traceable to § 1881a. But, because respondents can only speculate as to whether any (asserted) interception would be under § 1881a or some other authority, they cannot satisfy the “fairly traceable” requirement.
Third, even if respondents could show that the Government will seek the FISC’s authorization to acquire the communications of respondents’ foreign contacts under § 1881a, respondents can only speculate as to whether that court will authorize such surveillance. In the past, we have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment. In Whitmore, for example, the plaintiff’s theory of standing hinged largely on the probability that he would obtain federal habeas relief and be convicted upon retrial. In holding that the plaintiff lacked standing, we explained that “[i]t is just not possible for a litigant to prove in advance *414 that the judicial system will lead to any particular result in his case.” 495 U. S., at 159-160; see Defenders of Wildlife, supra, at 562.
We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors. Section 1881a mandates that the Government must obtain the FISC’s approval of targeting procedures, minimization procedures, and a governmental certification regarding proposed surveillance. §§ 1881a(a), (e)(1), (i)(2), (i)(3). The court must, for example, determine whether the Government’s procedures are “reasonably designed ... to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons.” § 1801(h); see §§ 1881a(i)(2), (i)(3)(A). And, critically, the court must also assess whether the Government’s targeting and minimization procedures comport with the Fourth Amendment. § 1881a(i)(3)(A).
Fourth, even if the Government were to obtain the FISC’s approval to target respondents’ foreign contacts under § 1881a, it is unclear whether the Government would succeed in acquiring the communications of respondents’ foreign contacts. And fifth, even if the Government were to conduct surveillance of respondents’ foreign contacts, respondents can only speculate as to whether their own communications with their foreign contacts would be incidentally acquired.
In sum, respondents’ speculative chain of possibilities does not establish that injury based on potential future surveillance is certainly impending or is fairly traceable to § 1881a.[5]
*415 B
Respondents’ alternative argument—namely, that they can establish standing based on the measures that they have undertaken to avoid § 1881a-authorized surveillance—fares no better. Respondents assert that they are suffering ongoing injuries that are fairly traceable to § 1881a because the risk of surveillance under § 1881a requires them to take' costly and burdensome measures to protect the confidentiality of their communications. Respondents claim, for instance, that the threat of surveillance sometimes compels them to avoid certain e-mail and phone conversations, to “tal[k] in generalities rather than specifics,” or to travel so that they can have in-person conversations. Tr. of Oral Arg. 38; App. to Pet. for Cert. 338a, 345a, 367a, 400a.[6] The Second Circuit panel concluded that, because respondents are already suffering such ongoing injuries, the likelihood of interception under § 1881a is relevant only to the question whether respondents’ ongoing injuries are “fairly traceable” to § 1881a. See 638 F. 3d, at 133-134; 667 F. 3d, at 180 (opinion of Raggi, J.). Analyzing the “fairly traceable” element of standing under a relaxed reasonableness standard, see 638 F. 3d, at 133-134, the Second Circuit then held that “plaintiffs *416 have established that they suffered present injuries in fact— economic and professional harms—stemming from a reasonable fear oí future harmful government conduct,” id., at 138.
The Second Circuit’s analysis improperly allowed respondents to establish standing by asserting that they suffer present costs and burdens that are based on a fear of surveillance, so long as that fear is not “fanciful, paranoid, or otherwise unreasonable.” See id., at 134. This improperly waters down the fundamental requirements of Article III. Respondents’ contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending. See Pennsylvania v. New Jersey, 426 U. S. 660, 664 (1976) (per curiam); National Family Planning & Reproductive Health Assn., Inc. v. Gonzales, 468 F. 3d 826, 831 (CADC 2006). Any ongoing injuries that respondents are suffering are not fairly traceable to § 1881a.
If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear. As Judge Raggi accurately noted, under the Second Circuit panel’s reasoning, respondents could, “for the price of a plane ticket, . . . transform their standing burden from one requiring a showing of actual or imminent. . . interception to one requiring a showing that their subjective fear of such interception is not fanciful, irrational, or clearly unreasonable.” 667 F. 3d, at 180 (internal quotation marks omitted). Thus, allowing respondents to bring this action based on costs they incurred in response to a speculative threat would be tantamount to accepting a repackaged version of respondents’ first failed theory of standing. See ACLU, 493 F. 3d, at 656-657 (opinion of Batchelder, J.).
*417 Another reason that respondents’ present injuries are not fairly traceable to § 1881a is that even before § 1881a was enacted, they had a similar incentive to engage in many of the countermeasures that they are now taking. See id., at 668-670. For instance, respondent Scott McKay’s declaration describes—and the dissent heavily relies on—McKay’s “knowledge” that thousands of communications involving one of his clients were monitored in the past. App. to Pet. for Cert. 370a; post, at 426-426, 429. But this surveillance was conducted pursuant to FISA authority that predated § 1881a. See Brief for Petitioners 32, n. 11; Al-Kidd v. Gonzales, No. 06-cv-93, 2008 WL 5123009 (D Idaho, Dec. 4, 2008). Thus, because the Government was allegedly conducting surveillance of McKay’s client before Congress enacted § 1881a, it is difficult to see how the safeguards that McKay now claims to have implemented can be traced to § 1881a.
Because respondents do not face a threat of certainly impending interception under § 1881a, the costs that they have incurred to avoid surveillance are simply the product of their fear of surveillance,[7] and our decision in Laird makes it clear that such a fear is insufficient to create standing. See 408 U. S., at 10-15. The plaintiffs in Laird argued that their exercise of First Amendment rights was being “chilled by the mere existence, without more, of [the Army’s] investigative and data-gathering activity.” Id., at 10. While acknowledging that prior cases had held that constitutional violations may arise from the chilling effect of “regulations that fall short of a direct prohibition against the exercise of *418 First Amendment rights,” the Court declared that none of those cases involved a “chilling effect arising] merely from the individual’s knowledge that a governmental agency was engaged in certain activities or from the individual’s concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual.” Id., at 11. Because “[allegations of a subjective ‘chill’ are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm,” id., at 13-14, the plaintiffs in Laird—and respondents here—lack standing. See ibid.) ACLU, supra, at 661-662 (opinion of Batchelder, J.) (holding that plaintiffs lacked standing because they “allege[d] only a subjective apprehension” of alleged NS A surveillance and “a personal (self-imposed) unwillingness to communicate”); United Presbyterian Church, 738 F. 2d, at 1378 (holding that plaintiffs lacked standing to challenge the legality of ah Executive Order relating to surveillance because “the ‘chilling effect’ which is produced by their fear of being subjected to illegal surveillance and which deters them from conducting constitutionally protected activities, is foreclosed as a basis for standing” by Laird).
For the reasons discussed above, respondents’ self-inflicted injuries are not fairly traceable to the Government’s purported activities under § 1881a, and their subjective fear of surveillance does not give rise to standing.
IV
A
Respondents incorrectly maintain that “[t]he kinds of injuries incurred here—injuries incurred because of [respondents’] reasonable efforts to avoid greater injuries that are otherwise likely to flow from the conduct they challenge— are the same kinds of injuries that this Court held to support. standing in cases such as” Laidlaw, Meese v. Keene, 481 U. S. *419 465 (1987), and Monsanto. Brief for Respondents 24. As an initial matter, none of these cases holds or even suggests that plaintiffs can establish standing simply by claiming that they .experienced a “chilling effect” that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part. Moreover, each of these cases was very different from the present case.
In Laidlaw, plaintiffs’ standing was based on “the proposition that a company’s continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms.” 528 U. S., at 184. Because the unlawful discharges of pollutants were “concededly ongoing,” the only issue was whether “nearby residents”—who were members of the organizational plaintiffs—acted reasonably in refraining from using the polluted area. Id., at 183-184. Laidlaw is therefore quite unlike the present case, in which it is not “concede[d]” that respondents would be subject to unlawful surveillance but for their decision to take preventive measures. See ACLU, 493 F. 3d, at 686 (opinion of Batchelder, J.) (distinguishing Laidlaw on this ground); id., at 689-690 (Gibbons, J., concurring) (same); 667 F. 3d, at 182-183 (opinion of Raggi, J.) (same). Laidlaw would resemble this case only if (1) it were undisputed that the Government was using § 1881a-authorized surveillance to acquire respondents’ communications and (2) the sole dispute concerned the reasonableness of respondents’ preventive measures.
In Keene, the plaintiff challenged the constitutionality of the Government’s decision to label three films as “political propaganda.” 481 U. S., at 467. The Court held that the plaintiff, who was an attorney and a state legislator, had standing because he demonstrated, through “detailed affidavits,” that he “could not exhibit the films without incurring a risk of injury to his reputation and of an impairment of his *420 political career.” Id., at 467, 473-475. Unlike the present case, Keene involved “more than a ‘subjective chill’” based on speculation about potential governmental action; the plaintiff in that case was unquestionably regulated by the relevant statute, and the films that he wished to exhibit had already been labeled as “political propaganda.” See ibid.; ACLU, 493 F. 3d, at 663-664 (opinion of Batchelder, J.); id., at 691 (Gibbons, J., concurring).
Monsanto, on which respondents also rely, is likewise in-apposite. In Monsanto, conventional alfalfa farmers had standing to seek injunctive relief because the agency’s decision to deregulate a variety of genetically engineered alfalfa gave rise to a “significant risk of gene flow to non-genetically-engineered varieties of alfalfa.” 561 U. S., at 155. The standing analysis in that case hinged on evidence that genetically engineered alfalfa “ ‘seed fields [we]re currently being planted in all the major alfalfa seed production areas’ ”; the bees that pollinate alfalfa “ ‘have a range of at least two to ten miles’ and the alfalfa seed farms were concentrated in an area well within the bees’ pollination range. Id., at 154, and n. 3. Unlike the conventional alfalfa farmers in Monsanto, however, respondents in the present case present no concrete evidence to substantiate their fears, but instead rest on mere conjecture about possible governmental actions.
B
Respondents also suggest that they should be held to have standing because otherwise the constitutionality of § 1881a could not be challenged. It would be wrong, they maintain, to “insulate the government’s surveillance activities from meaningful judicial review.” Brief for Respondents 60. Respondents’ suggestion is both legally and factually incorrect. First, “ ‘[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.’” Valley Forge Christian College, 454 U. S., at 489; Schlesinger, 418 U. S., at 227; see also Richard *421 son, 418 U. S., at 179; Raines, 521 U. S., at 835 (Souter, J., joined by Ginsburg, J., concurring in judgment).
Second, our holding today by no means insulates § 1881a from judicial review. As described above, Congress created a comprehensive scheme in which the FISC evaluates the Government’s certifications, targeting procedures, and minimization procedures—including assessing whether the targeting and minimization procedures comport with the Fourth Amendment. §§1881a(a), (c)(1), (i)(2), (i)(3). Any dissatisfaction that respondents may have about the FISC’s rulings—or the congressional delineation of that court’s role—is irrelevant to our standing analysis.
Additionally, if the Government intends to use or disclose information obtained or derived from a § 1881a acquisition in judicial or administrative proceedings, it must provide advance notice of its intent, and the affected person may challenge the lawfulness of the acquisition. §§ 1806(c), (e), 1881e(a) (2006 ed. and Supp. V).[8] Thus, if the Government were to prosecute one of respondent-attorney’s foreign clients using § 188 la-authorized surveillance, the Government would be required to make a disclosure. Although the foreign client might not have a viable Fourth Amendment claim, see, e. g., United States v. Verdugo-Urquidez, 494 U. S. 259, 261 (1990), it is possible that the monitoring of the target’s conversations with his or her attorney would provide grounds for a claim of standing on the part of the attorney. Such an attorney would certainly have a stronger eviden-tiary basis for establishing standing than do respondents in the present case. In such a situation., unlike in the pres *422 ent case, it would at least be clear that the Government had acquired the foreign client’s communications using § 188 la-authorized surveillance.
Finally, any electronic communications service provider that the Government directs to assist in § 1881a surveillance may challenge the lawfulness of that directive before the FISC. §§ 1881a(h)(4), (h)(6). Indeed, at the behest of a service provider, the Foreign Intelligence Surveillance Court of Review previously analyzed the constitutionality of electronic surveillance directives issued pursuant to a now-expired set of FISA amendments. See In re Directives Pursuant to Section 105B of Foreign Intelligence Surveillance Act, 551 F. 3d 1004, 1006-1016 (2008) (holding that the provider had standing and that the directives were constitutional).
* * *
We hold that respondents lack Article III standing because they cannot demonstrate that the future injury they purportedly fear is certainly impending and because they cannot manufacture standing by incurring costs in anticipation of nonimminent harm. We therefore reverse the judgment of the Second Circuit and remand the case for further proceedings consistent with this opinion.

It is so ordered.

 The term “United States person” includes citizens of the United States, aliens admitted for permanent residence, and certain associations and corporations. 50 U. S. C. § 1801(i); see § 1881(a).

 Congress recently reauthorized the FISA Amendments Act for another five years. See 126 Stat. 1631.

 The dissent attempts to downplay the safeguards established by § 1881a. See post, at 425 (opinion of Breyer, J.). Notably, the dissent does not directly acknowledge that § 1881a surveillance must comport with the Fourth Amendment, see § 1881a(b)(5), and that the FISC must assess whether targeting and minimization procedures are consistent with the Fourth Amendment, see § 1881a(i)(3)(A).

 It was suggested at oral argument that the Government could help resolve the standing inquiry by disclosing to a court, perhaps through an in camera proceeding, (1) whether it is intercepting respondents’ communications and (2) what targeting or minimization procedures it is using. See Tr. of Oral Arg. 13-14, 44, 56. This suggestion is puzzling. As an initial matter, it is respondents’ burden to prove their standing by pointing to specific facts, Lujan v. Defenders of Wildlife, 504 U. S. 555, 561 (1992), not the Government’s burden to disprove standing by revealing details of its surveillance priorities. Moreover, this type of hypothetical disclosure proceeding would allow a terrorist (or his attorney) to determine whether he is currently under U. S. surveillance simply by filing a lawsuit challenging the Government’s surveillance program. Even if the terrorist’s attorney were to comply with a protective order prohibiting him from sharing the Government’s disclosures with his client, the court’s postdiselosure decision about whether to dismiss the suit for lack of standing would surely signal to the terrorist whether his name was on the list of surveillance targets.

 Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a “substantial risk” that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm. Monsanto Co. v. Geertson Seed Farms, 561 U. S. 139, 153 (2010). See also Pennell v. San Jose, 485 U. S. 1, 8 (1988); Blum v. Yaretsky, 457 U. S. 991, 1000-1001 (1982); Babbitt v. Farm Workers, 442 U. S. 289, 298 (1979). But to the extent that the “substantial risk” standard is relevant and is distinct from the “certainly impending” *415 requirement, respondents fall short of even that standard, in light of the attenuated chain of inferences necessary to find harm here. See supra, at 411-414. In addition, plaintiffs bear the burden of pleading and proving concrete facts showing that the defendant’s actual action has caused the substantial risk of harm. Plaintiffs cannot rely on speculation about “ ‘the unfettered choices made by independent actors not before the courts.’” Defenders of Wildlife, 504 U. S., at 562.

 For all the focus on respondents’ supposed need to travel abroad in light of potential § 1881a surveillance, respondents cite only one specific instance of travel: an attorney’s trip to New York City to meet with other lawyers. See App. to Pet. for Cert. 352a. This domestic travel had but a tenuous connection to § 1881a, because § 1881a-authorized acquisitions “may not intentionally target any person known at the time of acquisition to be located in the United States.” § 1881a(b)(1); see also 667 F. 3d 163, 202 (CA2 2011) (Jacobs, C. J., dissenting from denial of rehearing en banc); id., at 185 (opinion of Raggi, J. (same)).

 Although respondents’ alternative theory of standing rests primarily on choices that they have made based on their subjective fear of surveillance, respondents also assert that third parties might be disinclined to speak with them due to a fear of surveillance. See App. to Pet. for Cert. 372a-373a, 352a-353a. To the extent that such assertions are based on anything other than conjecture, see Defenders of Wildlife, 504 U. S., at 560, they do not establish injury that is fairly traceable to § 1881a, because they are based on third parties’ subjective fear of surveillance, see Laird v. Tatum, 408 U. S. 1, 10-14 (1972).

 The possibility of judicial review in this context is not farfetched. In United States v. Damrah, 412 F. 3d 618 (CA6 2005), for example, the Government made a pretrial disclosure that it intended to use FISA evidence in a prosecution; the defendant (unsuccessfully) moved to suppress the FISA evidence, even though he had not been the target of the surveillance; and the Sixth Circuit ultimately held that FISA’s procedures are consistent with the Fourth Amendment. See id., at 622, 623, 625.