Hamilton, Circuit Judge, concurring in part and dissenting in part. The good news for plaintiff Swanigan came several years ago, when a jury awarded him $60,000 for the violation of his constitutional rights by his prolonged detention after his arrest, which had been lawful but mistaken. The issue in this separate Monell suit is whether Swanigan should be allowed to seek further relief in the form of additional damages or an injunction. I agree with my colleagues that Swanigan is not entitled to additional damages based on what has been called the “hold past court call” policy or on his having been included in line-ups while he was in custody. I also agree that Swanigan does not have standing to seek an injunction against the “hold past court call” policy. Versions of this policy have been under constitutional attack for a generation. After a district judge declared the policy unconstitutional in 1986, the city immediately rescinded the policy, at least formally. Robinson v. City of Chicago, 868 F.2d 969, 962 (7th Cir. 1989). Yet cases involving the same practice continue, as in Swanigan’s case. See, e.g., Lopez v. City of Chicago, 464 F.3d 711, 721-22 (7th Cir. 2006) (reversing dismissal of claim for prolonged post-arrest detention for investigation); Willis v. City of Chicago, 999 F.2d 284, 288-89 (7th Cir. 1993) (affirming finding that prolonged post-arrest detention for investigation, before Robinson was decided, violated Fourth Amendment), citing County of Riverside v. McLaughlin, 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Swanigan cannot obtain an injunction against future application of the “hold past court call” policy or practice to him. He has not shown a substantial risk that the city will apply this policy or practice to him in the future, at least not without relying on an “attenuated chain of inferences” that impermissibly assumes future illegal state action. See Clapper v. Amnesty Int’l USA, 568 U.S. 398, 414 n.5, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013); City of Los Angeles v. Lyons, 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). I respectfully dissent, however, from the decision to affirm dismissal of Swanigan’s challenge to the “cleared-closed case” policy. He alleges that the Chicago Police Department maintains a file on him that effectively—but falsely—identifies him as the “Hard Hat Bandit.” This is not a case where the police suspected him of those crimes but were unable to prove guilt beyond a reasonable doubt. There is no doubt here, as my colleagues acknowledge. Swanigan was not the Hard Hat Bandit. In my view, he has standing to raise this claim, and on the merits he should be allowed to proceed past the pleadings. On this issue of standing, Swanigan can show that he is at “substantial risk” of being harmed by the “cleared-closed” policy. “Substantial risk” is the correct standard. See Susan B. Anthony List v. Driehaus, — U.S. —, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014) (“allegation of future injury may suffice if the threatened injury is ‘certainly impending,’ or there is a ‘“substantial risk” the harm will occur’ ”.), quoting Clapper v. Amnesty Int’l USA, 568 U.S. 398, 414 n.5, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013). On standing, the majority asserts that “it’s entirely speculative to suggest that a police officer might use the cleared-closed file to violate Swanigan’s rights in some unknown way in some hypothetical future traffic stop.” Ante at 584.1 respectfully disagree. There remains a substantial risk that harm will befall Swanigan, and, unlike with his challenge to the “hold past court call” practice, without having to assume intentional wrongdoing by either Swanigan or police officers. To begin with, the chances that Swani-gan will be subjected to just a routine traffic stop are actually quite high. Over a period of several years, the same is true for any random civilian driver. In just one year, police stopped more than ten percent of all drivers nationwide. U.S. Dep’t of Justice, Bureau of Justice Statistics, Police Behavior During Traffic and Street Stops, 2011, at 3, tbl. 1, https://www.bjs.gov/content/pub/pdf/pbtssll.pdf. For all black drivers, that percentage was higher, at 12.8 percent. Id. Over a five-year period, the chance that a given black driver will be pulled over is approximately 50 percent. (0.8725 = .504).[1] Over ten years, the chance increases to about 75 percent. (0.87210 - 0.254).[2] Cf. I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 431, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (applicant for asylum facing ten percent chance of persecution in country of origin would have “well-founded fear of being persecuted” for purposes of immigration law). Next, consider how any traffic stop of Swanigari in Chicago is likely to unfold as long as the false information is in his police file. When the police carry out a traffic stop, they are entitled to demand the driver’s identification, of course, and it is routine to check the driver’s record for active warrants, driving history, and criminal history. Those checks are done for important reasons, including officer safety. If the files are. checked, the officer checking Swanigan may well be told that the police department believes he committed a series of armed robberies. At that point, an officer’s normal caution will give way immediately to extreme caution, putting Swanigan at a much higher risk that any movement might be misinterpreted as dangerous. And note that this scenario assumes lawful and reasonable actions by both Swanigan and a police officer. How many cases have we seen in this country of unarmed subjects, especially men of color, being shot and even killed by police based on hair-trigger responses to innocent actions? In my view, these risks for Swani-gan—today—are not speculative but substantial. He has alleged, and should be allowed to prove, that he has standing to challenge the “cleared-closed case” policy as applied to him. On the merits of this claim, Swanigan would face a challenge. Ordinarily a civilian has no cognizable legal interest in what police investigative files say about him. Paul v. Davis, 424 U.S. 693, 697, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), held that even a public accusation by the police that a civilian was an “active shoplifter ” did not' violate the due process clause of the Fourteenth Amendment. But what Swanigan alleges here is an extreme case with substantial risk of tangible harm not present in that case. And there is virtually nothing to be said here.for the integrity of the police files. At .this point, after the conviction of the real Hard Hat Bandit, the police refusal to correct the files falsely labelling Swanigan the Hard Hat Bandit is arbitrary and capricious—and dangerous. Constitutional law (not to mention common sense) establishes that the police are entitled to rely on such information in their files, e.g., DeLuna v. City of Rockford, 447 F.3d 1008, 1011-12 (7th Cir. 2006) (use of deadly force was reasonable based in -part on officer’s knowledge of suspect’s history of.violence and weapons), even if it turns out to be mistaken. See, e.g., Herring v. United States, 555 U.S. 135, 146, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (exclusionary rule not applicable to arrest based on mistaken information about active warrant); Catlin v. City of Wheaton, 574 F.3d 361, 365-66 (7th Cir. 2009) (police acted reasonably in tackling man they mistakenly believed was armed and dangerous felon who had announced his intention to flee or fight rather than be arrested). Note, however, that in Herring the Supreme Court assumed that police reliance on knowingly false, or even recklessly or systematically mistaken, informa-, tion would not be reasonable. 555 U.S. at 146,129 S.Ct. 695. Based on Swanigan’s allegations, it is hard to understand how the false information that is still in his police file is the product of anything other than knowing falsity or deliberate indifference to the truth. Why not allow a civilian who faces substantial risk of harm due to false police information an opportunity to have that information corrected? And on the other side of the scales, what harm would the Chicago police or public suffer if the plainly false, information were corrected? Again, that information is not just unproven or contestable—it is false. I cannot think of any harm such a correction would cause the police, and it might well help avoid a tragedy. I would allow Swani-gan to pursue this claim on .the merits beyond the pleadings so that the courts could address it and its potential ramifications based on real evidence rather than allegations and theoretical arguments. . These rough calculations assume that no variable would cause certain drivers to be pulled over more than others. I am under no illusions that these ''ideal" conditions prevail in the real world, but I doubt that any such variables would alter these estimates so dramatically as to make Swanigan’s risks insubstantial. . In Chicago, the racial disparity may be . higher. According to a State of Illinois study of traffic stop data, more than 76 percent of all traffic stops conducted by Chicago police involve minority ' drivers, Illinois Dep’t of Transp., Illinois Traffic Stop Study Statewide & Agency Reports 2015, at 146, https://idot. ■illinois.gov/transportation-system/local-transportationpartners/law-enforcement/ illinois-traffic-stop-study. Nearly half of all traffic stops in the city involve black drivers. Id.