[Cite as *Preterm-Cleveland, Inc. v. Kasich*, 2016-Ohio-4859.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 103103

# PRETERM-CLEVELAND, INC.

#### PLAINTIFF-APPELLANT

vs.

# GOVERNOR JOHN R. KASICH, ET AL.

#### DEFENDANTS-APPELLEES

## JUDGMENT:
## REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-13-815214

**BEFORE:** McCormack, J., E.A. Gallagher, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** July 7, 2016

**ATTORNEYS FOR APPELLANT**

Beatrice Jessie Hill
Case Western Reserve University
School of Law
11075 East Blvd.
Cleveland, OH 44106

Elizabeth Bonham
Freda J. Levenson
American Civil Liberties Union of Ohio
4506 Chester Ave.
Cleveland, OH    44103

Lorie A. Chaiten
Roger Baldwin Foundation of ACLU, Inc.
180 North Michigan Ave.
Suite 2300
Chicago, IL 60601

Justine L. Konicki
Susan O. Scheutzow
Kohrman, Jackson & Krantz P.L.L.
One Cleveland Center, 20th Floor
1375 East Ninth St.
Cleveland, OH 44114

Jennifer Lee
American Civil Liberties Union of Ohio
125 Broad St.
New York, NY 10004

**ATTORNEYS FOR APPELLEES**

**For John R. Kasich, et al.**

Mike De Wine
Ohio Attorney General

By:    Tiffany L. Carwile
Ryan L. Richardson
Assistant Attorneys General
Constitutional Offices Section
30 East Broad St., 16th Floor
Columbus, OH 43215

**For Timothy J. McGinty**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Charles E. Hannan
Assistant County Prosecutor
1200 Ontario St., 8th Floor
Cleveland, OH 44113

TIM McCORMACK, J.:

**{¶1}** Plaintiff-appellant, Preterm-Cleveland, Inc. ("Preterm"), appeals the trial court's granting summary judgment for defendants and denying Preterm's summary judgment motion. For the reasons that follow, we reverse the decision of the trial court as it relates to defendants' motion for summary judgment concerning standing and remand to the trial court for further proceedings consistent with this opinion.

Procedural History and Substantive Facts

**{¶2}** Preterm is a state-licensed ambulatory surgical facility ("ASF") that provides reproductive health services, including family planning and abortion procedures and care. On October 9, 2013, Preterm filed a complaint seeking injunctive and declaratory relief against the following: Governor John R. Kasich; the state of Ohio; the Ohio Department of Health; Theodore E. Wymslo, M.D.; the State Medical Board of Ohio; its members Anita M. Steinbergh, D.O.; Kris Ramprasad, M.D.; J. Craig Strafford, M.D., M.P.H., F.A.C.O.G.; Mark A. Bechtel, M.D.; Michael L. Gonidakis; Donald R. Kenney, Sr.; Bruce R. Saferin, D.P.M.; Sushil M. Sethi, M.D., M.P.H., F.A.C.S.; Amol Soin, M.D., M.B.A.; Lance A. Talmage, M.D.; the Ohio Department of Job and Family Services; Michael B. Colbert; and Cuyahoga County Prosecutor Timothy J. McGinty.

**{¶3}** In its complaint, Preterm alleges that the 2014-2015 Ohio Budget Bill, Am.Sub.H.B.No. 59 ("HB 59") violated the one-subject rule of the Ohio Constitution,

Article II, Section 15(D). Specifically, it alleges that three provisions of HB 59 — the "heartbeat provisions," the "written transfer agreement provisions," and the "parenting and pregnancy provisions" — have no relation to appropriations and therefore destroy the bill's unity of purpose.

{¶4} Initially, defendants moved to dismiss Preterm's complaint on the grounds that Preterm lacked standing to challenge HB 59. The trial court denied defendants' motion, finding that Preterm was "threatened with a direct and concrete injury by the enactment of the written transfer agreement provisions, which regulate licensing of an ASF in a restrictive and onerous manner." Thereafter, Preterm moved for summary judgment, claiming that HB 59 violated the one-subject rule of the Ohio constitution as a matter of law. In response, Prosecutor McGinty moved for partial summary judgment regarding the noncriminal provisions of the budget bill ("written transfer agreement provisions" and "parenting and pregnancy provisions"), which Preterm did not oppose. The remaining defendants also moved for summary judgment against Preterm, claiming that Preterm lacked standing to challenge HB 59.

{¶5} On May 18, 2015, following a hearing on summary judgment, the trial court granted defendants' motion regarding standing, finding that Preterm lacked standing to challenge each of the relevant provisions of HB 59. The trial court explained that its review upon summary judgment was much broader and therefore permitted consideration of a wider range of admissible evidence. The court also granted Prosecutor McGinty's partial motion for summary judgment regarding the "parenting and pregnancy provisions"

and the "written transfer agreement provisions," finding such claims unopposed and conceded by Preterm. Finally, determining that Preterm lacked standing, the trial court declined to address the merits of Preterm's motion for summary judgment as it related to a violation of the one-subject rule.

{¶6} Preterm now appeals the trial court's judgment, assigning the following errors for our review:

I. The trial court erred in granting summary judgment for the defendants based on its erroneous conclusion that Preterm lacked standing.

II. The trial court erred in denying Preterm's motion for summary judgment, which demonstrated as a matter of law, that HB 59 blatantly violates the one-subject rule of the Ohio constitution.

Summary Judgment

{¶7} Summary judgment is appropriate when: (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) after construing the evidence most favorably for the party against whom the motion is made, reasonable minds can reach only a conclusion that is adverse to the nonmoving party. Civ.R. 56(C)._ Once a moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the moving party's pleadings; rather, it has a reciprocal burden of setting forth specific facts demonstrating that there is a genuine triable issue. *State ex rel. Zimmerman v. Tompkins*, 75 Ohio St.3d 447, 449, 663 N.E.2d 639 (1996).

{¶8} We review the trial court's judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).

Standing

{¶9} It is well established in Ohio that before a court can properly consider the merits of a claim, the party seeking relief must establish standing to sue. *State ex rel. Walgate v. Kasich*, Slip Opinion No. 2016-Ohio-1176, ¶ 18; *Ohio Contrs. Assn. v. Bicking*, 71 Ohio St.3d 318, 320, 643 N.E.2d 1088 (1994). Under traditional standing principles, a plaintiff must show that it has suffered "'(1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct, and (3) likely to be redressed by the requested relief.'" *ProgressOhio.org, Inc. v. JobsOhio*, 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, ¶ 7, quoting *Moore v. Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, 975 N.E.2d 977, ¶ 22.

{¶10} The injury need not be large or economic, but it must be "palpable." *LULAC v. Kasich*, 10th Dist. Franklin No. 10AP-639, 2012-Ohio-947, ¶ 21; *see State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451, 469-470, 715 N.E.2d 1062 (1999) ("any injury, however small, is sufficient for purposes of private-action standing * * *"). The injury, however, may not be merely speculative. *LULAC*.

{¶11} When challenging the constitutionality of a legislative enactment, the party must demonstrate that it "has suffered or is threatened with direct and concrete injury in a manner or degree different from that suffered by the public in general." *Sheward* at 469-470. "[P]rivate citizens may not restrain official acts when they fail to allege and

prove damage to themselves different in character from that sustained by the public generally." *State ex rel. Masterson v. Ohio State Racing Comm.*, 162 Ohio St. 366, 368, 123 N.E.2d 1 (1954), citing 39 Ohio Jurisprudence, 22, Section 12; 52 American Jurisprudence, 3, Section 3. However, "[n]otwithstanding the general requirement for injury, standing is a self-imposed judicial rule of restraint, and courts 'are free to dispense with the requirement for injury where the public interest so demands.'" *Akron Metro. Hous. Auth. Bd. of Trustees v. State*, 10th Dist. Franklin No. 07AP-738, 2008-Ohio-2836, ¶ 11, quoting *Sheward* at 470.

{¶12} When a party challenging the legality of a government action is "an object of the action, * * * there is ordinarily little question" that the action caused injury and a judgment preventing the action will redress it. *Clifton v. Blanchester*, 131 Ohio St.3d 287, 2012-Ohio-780, 964 N.E.2d 414, ¶ 16; *Planned Parenthood Sw. Ohio Region v. Dewine*, 64 F.Supp.3d 1060, 1065 (S.D.Ohio 2014) (plaintiffs had standing to challenge a statute where they were "indisputably targeted" by the statute); *Navegar, Inc. v. United States*, 322 U.S.App.D.C. 288, 103 F.3d 994, 1000 (1997) (finding it unlikely that the legislature would enact laws targeting a specific industry if it had no intention of applying those laws to the individual participants in that particular industry).

{¶13} A party in a one-subject rule challenge, who alleges injury from a particular provision of the legislation, has standing where it challenges the enactment of the legislation in its entirety. *Akron Metro. Hous. Auth. Bd. of Trustees v. State*, 10th Dist. Franklin No. 07AP-738, 2008-Ohio-2836, ¶ 14. "Because [the party] alleged injury

resulting from the enactment of the legislation, [it has] a direct interest in the challenged legislation that is adverse to the legal interests of the state and gives rise to an actual controversy for the courts to decide." *Id.* To deny standing in a case where a party alleged injury by anything less than all of the provisions of the statute it challenged "would insulate legislation from one-subject constitutional scrutiny unless a coalition of plaintiffs could be assembled to cover the wide variety of subjects amassed in a single piece of legislation." *Id.*

{¶14} Whether a party has established standing is a question of law, which this court reviews de novo. *Moore v. Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, 975 N.E.2d 977, ¶ 20, citing *Cuyahoga Cty. Bd. of Commrs. v. State*, 112 Ohio St.3d 59, 2006-Ohio-6499, 858 N.E.2d 330, ¶ 23.

{¶15} Here, Preterm contends that it has standing to challenge HB 59, particularly as it relates to the "heartbeat provisions," the "written transfer agreement provisions," and the "parenting and pregnancy provisions." Specifically, Preterm provides that it has suffered direct and concrete injury that will be redressed by the relief sought. Additionally, Preterm claims that, as an abortion provider and an ASF, it is a direct target of the statute and therefore has standing to challenge the same.

{¶16} In support of its position, Preterm submits the affidavit of its Director of Clinic Operations, Heather Harrington. Harrington is responsible for the creation and implementation of policies and protocols for the day-to-day operation of Preterm,

including abortion procedures. In her affidavit, Harrington states that Preterm has been burdened and injured as a result of the passage of HB 59.

{¶17} In accordance with the "heartbeat provisions," a person who intends to perform or induce an abortion on a pregnant woman shall, at least 24 hours prior to the procedure, determine whether there is a detectable fetal heartbeat of the "unborn human individual"; give the pregnant woman the option to view or hear the fetal heartbeat; record the estimated gestational age of the "unborn human individual," the method of testing, the date and time of the test, and the results of the test; and inform the pregnant woman of the statistical probability of carrying the pregnancy to term. *See* R.C. 2919.191; 2919.192; 2317.56. With certain exceptions, no person shall perform an abortion before determining whether there is a detectable heartbeat. *Id.* The failure to satisfy the provisions' requirements may be the basis for civil liability, criminal prosecution, or disciplinary actions by the state medical board. *Id.*; R.C. 4731.22.

{¶18} Harrington avers that in order to comply with the heartbeat provisions, Preterm has been forced to amend its policies, procedures, and protocols concerning informed consent. In particular, Preterm conducted extensive research to determine the "statistical probability of bringing the fetus to term based on the gestational age of the fetus"; it created a new policy entitled "Fetal Heartbeat and Probability," incorporating the newly mandated protocols, which also involved creating a new form for placement into patient files; it has undertaken additional patient record-keeping responsibilities not previously necessary; and it abandoned some of its prior practices regarding the manner

in which Preterm provided services to its patients. Additionally, Harrington provides that the heartbeat provisions have placed an additional strain on its staff, requiring unexpected scheduling changes for staff and patients. For example, if a heartbeat is detected when a pregnant woman returns for her procedure (after her initial visit), Preterm must provide the patient an opportunity to view or hear the heartbeat and schedule another appointment for 24 hours later for the procedure. According to Harrington, in some cases, depending on the type of procedure, Preterm must now schedule the patient for three to five visits. Finally, Preterm alleges that it is subject to criminal prosecution and/or civil liability if it does not comply with the heartbeat provisions.

{¶19} The "written transfer agreement provisions" require all ASFs to maintain a written transfer agreement with a local hospital that specifies the procedures for transfer of patients from the facility to the hospital when medical care beyond the care provided at the ASF is necessary, including emergency situations; the agreement must be updated every two years; and the ASF must file a copy of the agreement with the director of health. R.C. 3702.303. The director of health conducts an inspection of the facility each time the facility submits an application for license renewal. R.C. 3702.302. An ASF's license will not be renewed if, upon inspection, the director determines that the ASF has not complied with "all quality standards established by the director" or the most recent version of the updated written transfer agreement is not "satisfactory." *Id.* Additionally, the statute requires the ASF to notify the director within one business day if the facility modifies any provision of its transfer agreement, within 48 hours if it modifies

its operating procedures or protocols, or within one week if it becomes aware of disciplinary action that may affect a consulting physician. R.C. 3702.307. Finally, the statute prohibits public hospitals from entering into agreements with facilities that provide nontherapeutic abortions. R.C. 3727.60(B).

{¶20} In her affidavit, Harrington asserts that the written transfer agreement provisions impose new burdens on Preterm. Specifically, Preterm must update the existing agreement and file a copy of the updated agreement every two years, whereas previously, Preterm maintained an agreement for a one-year term that was automatically renewable. The filing of the agreement is now separate from the filing of its ASF license renewal application and is a new administrative requirement. Harrington submits, additionally, that the new provisions limit the number of hospitals with which Preterm can contract.

{¶21} The "parenting and pregnancy provisions" create a new program that provides services for pregnant women and parents caring for their children, including promoting childbirth, parenting, and alternatives to abortion. R.C. 5101.804. The program authorizes the allocation of federal temporary assistance to needy families. *Id.* The funded entities are prohibited from providing abortion counseling, referrals to abortion clinics, performing abortion-related medical procedures, or engaging in pro-abortion advertisement. R.C. 5101.804(B) and (C). Although Preterm initially included the parenting and pregnancy provisions as one of the "offending provisions" of HB 59, Harrington's affidavit fails to address such provisions. Thus, Preterm apparently

concedes that it has not been injured by the provisions. Nonetheless, Preterm maintains that the injury it has suffered, or will suffer, by and through the heartbeat and written transfer agreement provisions, is sufficient for purposes of establishing standing.

{¶22} Defendants respond that Preterm lacks standing to challenge HB 59 where it cannot demonstrate that it was directly injured by the parenting and pregnancy provisions and the injury claimed by the heartbeat provisions and the written transfer agreement provisions was merely "hypothetical." Defendants further argue that Preterm cannot claim injury as a direct target because this theory does not relieve Preterm of the obligation to establish an injury.

{¶23} Here, in construing the evidence most favorably for Preterm, as we are required to do upon consideration of a summary judgment motion, we find that Preterm has established standing sufficient to challenge HB 59. It is abundantly clear and universally understood regardless of where the observer stands on the core issues that Preterm has been the intended target of certain regulatory provisions of HB 59, referred to as the "heartbeat provisions," the "written transfer agreement provisions," and the "parenting and pregnancy provisions." The heartbeat provisions, in particular, regulate the nature and duration of procedures followed by a person who intends to perform or induce an abortion on a pregnant woman, including procedures regarding heartbeat detection, viewing or listening to the detected heartbeat, follow-up appointments, and informed consent, in general.

{¶24} Defendants argue that the heartbeat provisions regulate and impose obligations on the physicians who perform the abortion, rather than the clinic. Physicians, however, do not work alone. Physicians cannot and do not provide abortion services without the organized administration, real estate, and medical expertise of the clinic that provides abortion care, the clinic's staff, or its equipment. It necessarily follows that such provisions that target the person performing the abortion likewise target the clinic where the abortion is ultimately performed. It is a site and medical team. To argue that the provisions exclusively target just an individual performing the actual abortion procedure and not also the clinic where the abortion services are provided is most disingenuous. Every woman and man in Ohio understands that reality, basic truth.

{¶25} Preterm has demonstrated that it has changed its protocols and procedures in order to comply with the new provisions in order to avoid criminal prosecution, civil liability, or losing its ASF license. Specifically, Preterm conducted extensive research, created a new "Fetal Heartbeat and Probability" policy, created a new form detailing the new requirements, and incurred additional staffing issues. Additionally, Preterm provides that it is now mandated to update anew its written transfer agreement every two years, file the transfer agreement with the director of health, and separately file its ASF license renewal application.

{¶26} Although Preterm's injury is seemingly minimal, it is sufficiently concrete and particularized for standing purposes. *See LULAC*, 10th Dist. Franklin No. 10AP-639, 2012-Ohio-947 (finding a concrete injury, however slight, where an individual

gathered the additional requested information, drove to the deputy registrar, stood in line, provided the requested information, and payed an additional $3.50 processing fee); *Little Sisters of the Poor Home for the Aged v. Sebelius*, 6 F. Supp.3d 1225 (D.Colo.2013) (finding an annual cost of $44 for preparation of a self-certification form sufficient for standing); *Natl. Collegiate Athletic Assn. v. Califano*, 622 F.2d 1382, 1386 (10th Cir.1980) ("out-of-pocket cost to a business of obeying a new rule of government" is sufficient to constitute an injury in fact); *Hydro Res. Inc. v. EPA*, 608 F.3d 1131, 1144-45 (10th Cir. 2010) (business costs of undertaking permitting process are injury in fact). And Preterm's injury need not be quantified or limited to economic harm. *See Frank v. United States*, 78 F.3d 815 (2d Cir.1996), *rev'd on other grounds*, 521 U.S. 1114, 117 S.Ct. 2501, 138 L.Ed.2d 1007 (1997) (the sheriff's additional workload resulting from compliance with a gun-control statute constituted injury for standing purposes).

{¶27} Moreover, Preterm's changing of policies, protocols, and procedures out of fear of sanctions, or in order to avoid liability, is sufficient for establishing standing. The legislature would not enact laws targeting a specific industry if it had no intention of applying those laws to the individual participants in that particular industry. *Navegar, Inc. v. United States*, 103 F.3d 994, 1000 D.C.Cir.1996). Thus, where there is a "threat of prosecution," Preterm has established standing. *Id.* at 1001.

{¶28} And because Preterm has established an injury in at least one of the provisions of HB 59, and it is the direct target of such legislation, we find that Preterm has established standing to challenge the legislation as a violation of the one-subject rule.

{¶29} We note that this case has come to us because the constitutional remedies of due process were thwarted. There are techniques very much recognized in law, such as raising the issue of a party's standing to sue, that ultimately can help ensure fairness and relevant decision making. Precluding litigants from moving forward with their claims when they lack legitimate standing has its place. Conversely, prematurely blocking parties in interest from their right to speak to their General Assembly or having their day in court because the subject matter they bring forward is inherently divisive, volatile, repulsive, or just plain difficult is another matter. Here, appellant Preterm found the statehouse door closed to them, thereby providing no opportunity for public deliberation and debate on these provisions. Now it finds the courthouse door shut, thus denying it access to court relief. The right of the people to petition their governments to seek redress and to access its courts was enshrined in our state and federal constitutions. It is precisely that which the founders of our constitutions sought to protect. They clearly envisioned a scenario such as this.

{¶30} It is not by happenstance that we have maintained domestic tranquility in America for most of our nearly 250 years in large part because Americans have had access to the highly effective remedies of relief the three branches of government are mandated to provide. It is no remedy to an aggrieved party to have keys inserted and doors locked to the statehouse and courthouse. As Americans, we breathe more deeply, healthily, when we listen to each other, consider opposite points of view, and then decide in the open.

**{¶31}** This conflict needs space for resolution. Appropriate access to the courts is unquestionably a fundamental constitutional right. The courts provide legal recourse by which citizens may redress their grievances, regardless of the uncomfortable nature of the subject matter. In ensuring that Preterm have its day in court, we reinforce this most basic tenet of our system of jurisprudence.

**{¶32}** Accordingly, Preterm's first assignment of error is sustained.

**{¶33}** Because the trial court did not reach the merits of Preterm's claim that HB 59 violated the one-subject rule of the Ohio constitution, we decline to address Preterm's second assignment of error and remand to the trial court for further proceedings consistent with this opinion.

**{¶34}** This cause is reversed and remanded to the lower court for further proceedings consistent with this opinion.

It is ordered that appellant recover of said appellees costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

EILEEN A. GALLAGHER, P.J., CONCURS;

MELODY J. STEWART, J., DISSENTS (WITH SEPARATE OPINION ATTACHED)

MELODY J. STEWART, J., DISSENTING:

{¶35} I do not believe that Preterm has established its standing to challenge the constitutionality of HB 59 because it has not shown that it suffered any concrete or direct injury from the legislation. Most of what Preterm claims as injuries could only be suffered by potential patients and medical providers who perform abortions — persons who could have standing if they were parties to this action. To the extent that Preterm does allege that it has suffered an injury, the record is clear that those injuries have yet to occur and, even if they did occur, would not be direct or concrete. For this reason, I would find that the court did not err by concluding that Preterm lacked standing and properly dismissed the complaint.

## I. Standing

{¶36} Preterm's declaratory judgment action asked the court to declare the 2014-2015 Ohio Budget Bill, 2013 Am.Sub.H.B.No. 59 ("HB 59") unconstitutional because it contained abortion-related provisions that went beyond the scope of a budget bill — a claimed violation of Article II, Section 15(D) of the Ohio Constitution, known as the "one-subject" rule.

{¶37} The case or controversy limitation that underpins notions of standing is "built on separation-of-powers principles [and] serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Internatl. USA*, 568 U.S.___, 133 S.Ct. 1138, 1146, 185 L.Ed.2d 264 (2013). When a private

litigant attacks the constitutionality of a legislative enactment, standing requires a showing that (1) the litigant has suffered or is threatened with direct and concrete injury in a manner or degree different from that suffered by the public in general, (2) that the law in question has caused the injury, and (3) that the relief requested will redress the injury. *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451, 469-470, 715 N.E.2d 1062 (1999). Because the injury that a private litigant must show in this context is an injury or threat of an injury in a manner or degree different from that suffered by the public in general, *Willoughby Hills v. C.C. Bar's Sahara, Inc.*, 64 Ohio St.3d 24, 27, 591 N.E.2d 1203 (1992), the injury must be "concrete" or "direct" in a way that goes beyond abstract or speculative harm. *Torres v. Cleveland*, 8th Dist. Cuyahoga No. 80695, 2002-Ohio-4431, ¶ 26.

## II. Heartbeat Provisions

{¶38} The court correctly held that Preterm lacked standing for most of the allegations of the complaint directed to the heartbeat provisions because those provisions applied only to persons performing abortions and patients. And because violations of the heartbeat provisions could only affect physicians, there is no merit to Preterm's assertion that it could suffer injury by way of criminal prosecution for violations committed by physicians. In addition, the court did not err by finding that Preterm's assertion that it could be subjected to future criminal prosecution was too speculative to show an injury sufficient to establish standing. Finally, Preterm's argument that HB 59 imposed an

administrative burden upon it fails because Preterm failed to point to specific, quantifiable costs associated with the new regulations being imposed.

{¶39} Preterm argues that the threat of criminal prosecution constituted a harm sufficient to constitute a direct and concrete injury under HB 59. It does so by reference to R.C. 2919.192(A), which defines the crime of performing or inducing an abortion without informed consent when there is a detectable fetal heartbeat, and which applies to any "person" who intends to perform or induce an abortion and fails to inform the pregnant woman in writing that the fetus has a heartbeat. Preterm notes that the criminal code includes a corporation within the definition of a "person," *see* R.C. 2901.01, and that because it is a nonprofit corporation, it is a "person" for purposes of R.C. 2919.192(A) and potentially subject to criminal prosecution for a violation of that section.

{¶40} We discern the legislature's intent "first of all in the language employed, and if the words be free from ambiguity and doubt, and express plainly, clearly, and distinctly the sense of the lawmaking body, there is no occasion to resort to other means of interpretation." *Slingluff v. Weaver*, 66 Ohio St. 621, 64 N.E. 574 (1902), paragraph two of the syllabus.

{¶41} Preterm's reading of R.C. 2919.192(A) as applying the word "person" to a corporation commits the error of failing to give all words in a statute meaning. *Carter v. Youngstown*, 146 Ohio St. 203, 207, 65 N.E.2d 63 (1946). Both R.C. 2919.192(A)(1) and (2) refer to "[t]he person intending to perform or induce the abortion[.]" The corporate entity called "Preterm" cannot actually perform or induce an abortion, so it

cannot violate R.C. 2919.192(A). Preterm simply has no exposure to criminal liability under R.C. 2919.192(A) and thus cannot demonstrate a harm or injury sufficient to confer standing.

{¶42} The majority concludes that physicians "do not work alone" and that it would be disingenuous to argue that the heartbeat provisions "exclusively target just an individual performing the actual abortion procedure and not also the clinic where the abortion services are provided[.]" *Ante* at ¶ 25. By doing so, the majority simply imposes its own interpretation of the statutes above the clear language of the heartbeat provision. And it does so by resorting to the statement, "[e]very woman and man in Ohio understands" the reality behind the heartbeat provision, to evade the issue raised under the heartbeat provision. And even if Preterm's interests are aligned with those of its medical personnel who actually perform or induce abortions, that alignment of interests does not mean that the legislature can hold Preterm criminally liable like those medical personnel who actually perform or induce an abortion. If the majority's reasoning is sound, it would mean that R.C. 2919.192(E) would not only expose the corporate entity known as Preterm to criminal punishment — a first violation of the heartbeat provisions a first-degree misdemeanor and subsequent violations a fourth-degree felony — but apparently its bookkeeper and janitorial staff, too, because they are "staff" without whose services a physician could not render abortion services. We should not interpret statutes to reach such a result. *Mishr v. Poland Bd. of Zoning Appeals*, 76 Ohio St.3d 238, 240, 667 N.E.2d 365 (1996).

**{¶43}** Preterm next argues that it is injured by HB 59 because it faces substantial administrative burdens in complying with the heartbeat provisions of R.C. 2919.192(A)(2). That section requires the person performing or inducing the abortion to inform the pregnant woman, to the best of the person's knowledge, of the statistical probability of bringing the fetus to term based on the gestational age of the fetus. As with R.C. 2919.192(A)(1), this section places the burden on the person intending to perform or induce the abortion. Preterm cannot actually perform or induce an abortion, so R.C. 2919.192(A)(2) imposes no burden upon it.

**{¶44}** Preterm also argues that it has suffered a concrete injury because it is being forced to amend its policies and protocols in ways that burden its patients and physicians. This argument is framed in terms of the burden placed on the physician and patient, not on Preterm itself. Preterm not only filed its complaint for declaratory relief in its name only, it specifically denied that it was relying on third-party standing. *See* Brief in Opposition to Motion to Dismiss, fn. 5. It cannot now claim to have standing based on an injury suffered by someone other than itself.

**{¶45}** Preterm next claims injury from the 24-hour waiting period required once the person who intends to perform or induce the abortion detects a fetal heartbeat. It maintains that the 24-hour waiting period burdens "those of Preterm's patients who live far from Preterm or would prefer to receive counseling from a non-Preterm physician, such as a family physician." Once again, this argument does not show an injury suffered

by Preterm, but by its patients and/or physicians. It is not a basis for finding that Preterm has standing to challenge HB 59.

**{¶46}** Preterm also claims that the 24-hour waiting period "creates logistical problems for Preterm's scheduling and administrative staff" because the waiting period "results in unexpected scheduling changes for both the patient and Preterm staff." These assertions do not establish a "direct and concrete injury" of the kind required when a private litigant who challenges the constitutionality of a statute seeks to show standing to bring the action. *Sheward*, 86 Ohio St.3d at 469-470, 715 N.E.2d 1062.

**{¶47}** In *Spokeo, Inc. v. Robins*, 578 U.S.___, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016), the United States Supreme Court held that a "concrete" injury is one that "must actually exist." *Id.* at 1548, citing *Black's Law Dictionary* 479 (9th Ed.2009). Preterm offered no evidence that any unexpected scheduling changes had occurred at the time it filed its complaint, so it failed to plead that it suffered any injury at because standing is determined "'on the state of things at the time the action is brought.'" *Fed. Home Loan Mtge. Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214, ¶ 25, quoting *Mollan v. Torrance*, 22 U.S. 537, 539, 6 L.Ed. 154 (1824). In addition, Preterm could only argue that some scheduling changes *might* unexpectedly occur in the future. Preterm's allegation that it might suffer an injury in the future is too speculative to be considered concrete enough to establish standing. *See, e.g.*, *In re Petition for Incorp. of Holiday City*, 70 Ohio St.3d 365, 371, 639 N.E.2d 42 (1994) (arguments

concerning what injuries may occur in event of incorporation were "speculative at best and fail to expose a present interest in the matters at issue").

**{¶48}** Finally, Preterm maintains that the R.C. 2919.192(A)(2) requirement that the person performing or inducing the abortion shall inform the pregnant woman, to the best of the person's knowledge, of the statistical probability of bringing the fetus to term based on the gestational age of the fetus, has required it to "conduct extensive research in order to determine what exactly the 'statistical probability of bringing the fetus to term based on the gestational age of the fetus' is for every stage of a fetus's development."

**{¶49}** The duty to inform the pregnant woman of the statistical probability information is a duty placed upon the "person intending to perform or induce the abortion." This duty does not fall on Preterm. Preterm's decision to conduct research on the issue of the probability of bringing the fetus to term based on the presence of a fetal heartbeat was one it voluntarily undertook for the benefit of those persons who would perform or induce an abortion. This was a self-inflicted injury because a party "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 133 S.Ct. at 1151, 185 L.Ed.2d 264.

**{¶50}** In addition, it appears that Preterm's "extensive" research was gratuitous given that the preamble to the Human Heartbeat Protection Act included the following findings by the General Assembly:

> The Ohio General Assembly finds that according to contemporary medical research:

1. As many as 30% of natural pregnancies end in spontaneous miscarriage;
2. Less than 5% of all natural pregnancies end in spontaneous miscarriage after detection of fetal cardiac activity;
3. Over 90% of in vitro pregnancies survive the first trimester if cardiac activity is detected in the gestational sac;
4. Nearly 90% of in vitro pregnancies do not survive the first trimester where cardiac activity is not detected in the gestational sac;
5. Fetal heartbeat, therefore, has become a key, medical predictor that an unborn human individual will reach viability and live birth;
6. Cardiac activity begins at a biologically identifiable moment in time,

normally when the fetal heart is formed in the gestational sac[.]

**{¶51}** It is true that R.C. 2919.192(C) states that "[t]he director of health *may* adopt rules that specify information regarding the statistical probability of bringing an unborn human individual possessing a detectable heartbeat to term based on the gestational age of the unborn human individual." (Emphasis added).  Preterm claimed that as of the date it filed its complaint, the director of health had not adopted any rules on the statistical probability information.  Nevertheless, R.C. 2919.192(A)(2) only requires a person intending to perform or induce an abortion to inform the pregnant woman "to the best of the person's knowledge."  The General Assembly's findings may be enough to suffice in the absence of any rules adopted by the director of health, at least for purposes of satisfying the "best of the person's knowledge" requirement of the statute.  Preterm's research was not required by the statute, so it could not be an injury for purposes of establishing standing.

III. Written Transfer Agreement

{¶52} Preterm argues that the court's ruling on the written transfer agreement provision ignored evidence that Preterm had been subjected to "onerous administrative burdens by requiring Preterm to update and file its written transfer agreement every two years." Preterm Brief in Opposition to Motion for Summary Judgment at 15. It also argued that R.C. 3727.60(B)(A) prohibits any "public hospital" from entering into a written transfer agreement with any ambulatory surgical facility in which "nontherapeutic abortions are performed or induced," thus diminishing the pool of available hospitals with which it could enter into a written transfer agreement.

{¶53} There was no evidence showing that Preterm had been subjected to "onerous" administrative burdens stemming from the written transfer agreement. Preterm conceded that at the time it filed its complaint (and since 2006), it has maintained a written transfer agreement with the same private hospital. Nothing in the written transfer agreements provision changed that fact. At the time it initiated this declaratory judgment action, Preterm had no concrete injury resulting from the enactment of the written transfer agreement provisions of HB 59.

{¶54} What Preterm really argues is that its *future* ability to obtain a written transfer agreement may be diminished because public hospitals have been barred from entering into written transfer agreements with nontherapeutic abortion clinics. With a current transfer agreement in place with a private hospital, Preterm's argument necessarily relies on speculation that at some point in the future it might not be able to obtain a transfer agreement with the same private hospital. Speculation does not

constitute actual and concrete injury. *See, e.g.*, *State ex rel. Walgate v. Kasich*, 2013-Ohio-946, 989 N.E.2d 140 (10th Dist.) (finding that plaintiff with gambling addiction lacked private standing to contest legislation approving casino gambling because plaintiff's allegation that increased availability of gambling might cause him injury was speculative and hypothetical).

**{¶55}** Preterm offered no evidence to support its assertion that it has been administratively burdened by the written transfer agreement provision of R.C. 3702.303. The only evidence offered by Preterm on this issue came from its director of clinic operations, who claimed that HB 59 required Preterm to "update its written transfer agreement every two years and to file a copy of the updated agreement with the Director of Health." Harrington aff. at ¶ 26. Yet Preterm acknowledged in an answer to an interrogatory that it presently had a one-year, written transfer agreement with a private hospital that automatically renewed. The R.C. 3702.303 requirement to update the transfer agreement biennially could not have caused Preterm any injury when it has for years been renewing its written transfer agreement on an annual basis. The statute may actually require Preterm to do less, not more.

**{¶56}** What remains is the R.C. 3702.303(B) requirement that an ambulatory surgical facility file a copy of an updated written transfer agreement with the director of health. This requirement imposed no additional burden on Preterm. Preexisting administrative regulations governed ambulatory surgical facilities and required them to "have a written transfer agreement with a hospital for transfer of patients in the event of

medical complications, emergency situations, and for other needs as they arise." Ohio Adm.Code 3701-83-19(E). In addition, ambulatory surgical facilities, which were classified as "health care facilities" for purposes of Ohio Adm.Code 3701-83(I)(1), were required to submit to the director of health a yearly application to renew the health care facility's license. *See* Ohio Adm.Code 3701-83-04(B). Preterm offered no evidence to show that R.C. 3702.303(B) imposed any burden in addition to what had previously been required of it by administrative regulation.

{¶57} The majority chooses not to address the actual nature of Preterm's injury and focuses on its conclusion that Preterm sufficiently alleged a "seemingly minimal injury." While even a minimal injury can support standing, Preterm's alleged injury comes without any quantification of what costs have been imposed upon Preterm. In fact, at no point has Preterm actually put a monetary cost on its so-called administrative burdens. This means that the "minimal" nature of Preterm's injury is arrived at through speculation or conjecture. The use of speculation means that Preterm's injury cannot be the kind of direct and concrete injury necessary to establish standing to challenge the constitutionality of a statute.

{¶58} I respectfully dissent.