IN THE UNITED STATES DISTRICT COURT 
 FOR THE MIDDLE DISTRICT OF ALABAMA 
 NORTHERN DIVISION 

LINDSEY BLAHOUS, on behalf of ) 
herself, as guardian for her minor ) 
children L.B., F.B., and D.I. and on ) 
behalf of all others ) 
similarly situated, ) 
 ) 
Plaintiff, ) 
 ) 
v. ) Case No. 2:19-cv-798-RAH-SMD 
 ) (WO) 
SARRELL REGIONAL ) 
DENTAL CENTER ) 
FOR PUBLIC HEALTH, INC., ) 
 ) 
Defendant. ) 

 MEMORANDUM OPINION AND ORDER 

I. INTRODUCTION 
For many, the phrase “data breach” provokes dread and invokes disquiet. 
Suddenly, a person’s once private information roams untrammeled, and a degree of 
uncertainty as to its location and possessor now unexpectedly exists. Of course, for 
as long as individuals and companies have maintained documentary records and 
stored private information, data has been poached. Then, as even now, cabinets were 
jimmied, trashcans were rifled through, and manila envelopes were haphazardly left 
open, furtively glimpsed. Once companies committed to storing files on local 
machines, enterprise databases, and cloud servers, however, breaching a company’s 
every bit of data required no more than gaining access to restricted networks. Soon 

enough, data breaches became inescapable features of a digitized world. 
This case grew from one such breach, its extent and depth still murky. 
Sometime in January 2019, hackers successfully infiltrated the computer network of 

Sarrell Regional Dental Center for Public Health, Inc. (“Sarrell” or “Defendant”), 
installing ransomware that could allow the hackers to demand payment for its 
deactivation (the “Breach”). Among Sarrell’s thousands of unsuspecting patients 
were Lindsey Blahous (“Blahous”) and her three minor children, L.B., F.B., and D.I. 

(“Minor Plaintiffs”) (collectively, “Plaintiffs”). Months later, after its investigation 
had purportedly yielded no evidence of copied, downloaded, or removed files, 
Sarrell notified each of the four Plaintiffs of the Breach in four substantively 

identical missives (“Notice” individually, and collectively, “Notices”). 
Faulting Sarrell for the personal data that the Breach may have exposed, 
Blahous sued on behalf of herself, her children, and others similarly situated in both 
tort and contract. Sarrell responded to Plaintiffs’ Complaint, (Doc. 1), with the 

Defendant’s Motion to Dismiss for Lack of Standing and Failure to State a Claim 
(the “Motion”), (Doc. 21), which sought dismissal pursuant to Rule 12 of the Federal 
Rules of Civil Procedure.1 As explained more fully below, this Court will grant the 
Motion pursuant to Rule 12(b)(1). 

II. FACTUAL AND PROCEDURAL BACKGROUND 
A. Data Breaches 
Though variously defined by governments and private organizations, the term 
“data breach” generally encompasses any security incident in which sensitive, 
protected or confidential data is copied, transmitted, accessed, viewed, stolen, or 
used by an individual unauthorized to do so. See, e.g., Ala. Code § 8-38-2(1). In the 

usual case, these attacks target data like financial information, personal health 
information, personally identifiable information (“PII”), trade secrets, and 
intellectual property. 

States like Alabama have enacted statutes that place obligations on businesses 
and government agencies regarding the protection of sensitive data they acquire or 
use such as social security numbers, driver’s license numbers, and financial account 
numbers; defining what constitutes a data breach; providing for what types of notice 

of a breach and the timing of the notice that must be provided to the parties whose 
data has been compromised; and creating certain exemptions. See, e.g., Ala. Code § 

1 Any reference in this opinion to “Rule []” or “Rules” is to one or more provisions 
of the Federal Rules of Civil Procedure. 
8-38-1 et seq.; see also Fla. Stat. Ann. §§ 282.318, 282.0041, 501.171; Ga. Code 
Ann. § 10-1-910 et seq. 

B. Relevant Facts2 
Sarrell is “the largest provider of dental services in Alabama,” one principally 
focused on children’s “dental and optical” needs. (Doc. 1 , p. 2.) Founded in 2004, 
its employees, totaling 250 by October 2019, had “serviced more than 845,000 
children.” (Doc. 1, p. 4.) 

Preceding the Breach, the Minor Plaintiffs visited Sarrell with their mother.3 
(Doc. 1, p. 3; see also Doc. 21, p. 16.) On September 12, 2019, Sarrell mailed notices 
of the Breach to approximately 391,472 patients and their guardians.4 (Doc. 1, pp. 

2-3; Doc. 21, pp.16, 41.) As the Notices explained, “[i]n July 2019, . . . Sarrell [had] 
detected ransomware on . . . [its] computer that appear[ed] to have been the result of 
an in intrusion that may have begun in January 2019,” a gap of seven months. (Doc. 

1-1, p. 2; Doc. 1-2, p. 2; Doc. 1-3, p. 2; Doc. 1-4, p. 2; see also Doc. 21, p.16.) 

2 Pursuant to Rule 12(b), the “facts” recounted here and throughout this opinion are 
presumed true solely for purposes of the Motion’s adjudication. 
3 Tellingly, Plaintiffs tender no detail as to the date, time, or frequency of their visits. 
4 The Notices, as appended to the Complaint, omitted the second page. (Doc. 21, p. 
16, n.2.) Sarrell included that page as an exhibit to the Motion. (Doc. 21-1.) 
According to the Notices, the Breach “may” have resulted in the disclosure of the 
Plaintiffs’ “personal health information.” (Doc. 1-1, p. 2.)5 

 In response, “out of an abundance of caution” and as a claimed demonstration 
of the seriousness with which it takes “the security of patient information,” Sarrell 
“immediately deactivated . . . [its] network, temporarily closed . . . [its] practices, 

engaged an independent computer security firm to investigate, and did not pay a 
ransom.” (Id.) When this investigation concluded, Sarrell’s “investigation ha[d] not 
found evidence that any files or information were copied, downloaded, or 
removed from . . . [its] network” or “discovered any evidence that the information 

that may be involved in this incident ha[d] been misused.” (Id. (emphasis in 
original).) The latter point is repeated in the Notices’ penultimate paragraph: “Again, 
at this time, we have found no evidence that your information had been misused.” 

(Doc. 21-1, p. 5.) 
Sarrell further admitted that “[t]he information potentially impacted may 
[have] include[d a patient’s] name, address, and health insurance number,” and in 
one letter, (see Doc. 1-2), social security numbers and health treatment information. 

5 For brevity purposes, since all four notices, (Doc. 1-1, p. 2; Doc. 1-2, p. 2; Doc. 1-
3, p. 2; Doc. 1-4, p. 2; see also Doc. 21, p.16), are virtually identical, the Court will 
simply refer to the first referenced Notice, (Doc. 1-1, p. 2), for the remainder of this 
Opinion. 
(Doc. 1-1, p. 2.) Sarrell stated that it could not “rule out the possibility that the hacker 
[had] obtained sensitive information from . . . [its] network.” (Id.) 

The Notices conveyed more than just these details as to the Breach. Opening 
with an apology for the inconvenience that the Breach and resulting shutdown of its 
operation “may” have caused, each of these two-page documents contained 

“information about steps . . . [its recipients could] take to protect . . . [their] 
information and the resources . . . [Sarrell was] making available...” (Id.) Among the 
most notable, Sarrell offered identity theft protection services, under the 
MyIDCare™ trademark, through ID Experts®, which included “twelve months of 

credit and CyberScan monitoring,” “a $1,000,000 insurance reimbursement policy,” 
and “fully managed ID theft recovery services.” (Id.) 
Towards the end of each Notice, Sarrell once more urged the recipient to 

utilize the data protection services. (Doc. 21-1, p. 5.) To be eligible for this benefit, 
a patient had to be over the age of eighteen and possess established credit within the 
U.S., a Social Security Number, and a U.S. residential address. (Doc. 1-1, p. 2.) 
Finally, Sarrell asserted that it had “rebuilt . . . [its] business systems with updated 

security and virus protection for the entire Sarrell network before reopening . . . [its] 
practices,” and that its systems and network were now “monitored with upgraded 
capabilities to ensure that . . . [its] system and the information . . . [it] store[s] will 

remain secure.” (Id.) 
Upon receipt of the Notices, Blahous acted, and apparently, suffered. She 
contacted “all three major credit bureaus in order to put credit freezes on her 

children’s credit.” (Doc. 1, p. 4.) She could not do this online, and she thus needed 
to “obtain [paper] copies of her children’s birth certificates to send to the credit 
bureaus along with a letter confirming her identity.” (Id.) Through the date of the 

Complaint, Blahous “continue[d] to monitor her accounts and pristine credit of her 
minor children,”6 and “remain[ed] concerned that the exposed PII, which included 
the birthdays and home addresses of her children, poses significant security and 
safety concerns”; up to that point at least, she had spent “her valuable time” on 

“protect[ing] the integrity of her children’s physical and fiscal well-being.” (Id.) 
As a result of the exposure of the Plaintiffs’ PII, they allegedly suffered four 
related injuries: (1) an increased risk of their identities being stolen in the future; (2) 

the costs to mitigate that risk (namely, monitoring their credit); (3) overpayment for 
dental services, on the theory that an unspecified portion of their payment was for 
securing their data, which Sarrell allegedly failed to do; and (4) the diminishment of 
the value of their PII by virtue of the possibility that it was exposed by the 

ransomware attack. (Id.) 

6 This statement is questionable, as not many minor children have any credit profile, 
much less a “pristine” one. 
Plaintiffs’ allegations can be summed as follows: The Breach was “a direct 
result of Defendant’s failure to implement adequate and reasonable cyber-security 

procedures and protocols necessary to protect Patient PII.” (Id. (emphasis added).) 
The Plaintiffs claim that Sarrell should have “take[n] adequate and reasonable 
measures to ensure its data systems were protected against unauthorized intrusions; 

. . . disclose[d] that it did not have adequately robust computer systems and security 
practices to safeguard Patient PII; . . . take[n] standard and reasonably available steps 
to prevent the . . . Breach; . . . monitor and timely detect the . . . Breach; and . . . 
provide Plaintiff and Class Members prompt and accurate notice of the . . . Breach.” 

(Id.) As a result, “Patient PII is now likely in the hands of thieves,” forcing the 
Plaintiffs to “spend,” now and in the future, “significant amounts of time and money 
in an effort to protect themselves from the adverse ramification of the . . . Breach” 

and “forever” endure “a heightened risk of identity theft and fraud.” (Id. (emphasis 
added).) 
B. Procedural Posture 
On October 21, 2019, Plaintiffs filed the Complaint and advanced four causes 
of action—Negligence (Count I); Negligence Per Se (Count II); Breach of Implied 

Contract (Count III); and Breach of Fiduciary Duty (Count IV)—that Plaintiffs hope 
to litigate as a class under Rule 23.7 (Doc. 1, pp. 19-31.) Sarrell filed its Motion to 
Dismiss on December 18, 2019. (Doc. 21.) Plaintiffs responded on January 17, 2020, 

(Doc. 26), and Sarrell replied on January 31, 2020, (Doc. 32). 
The Motion seeks dismissal of the Complaint’s four counts for lack of 
standing and for failure to state a claim pursuant to Rules 12(b)(1) and (b)(6), 

respectively. 
III. LEGAL STANDARD 
Rule 12(b)8 compels dismissal when a court lacks “subject matter jurisdiction” 
or a plaintiff lacks standing to appear and be heard. Fed. R. Civ. P. 12(b)(1). In 
contrast with the constraints imposed on a court’s consideration under Rule 12(b)(6), 

factual challenges under Rule 12(b)(1) allow a court to consider “matters outside the 
pleadings, such as testimony and affidavits.” McElmurray v. Consol. Gov’t of 
Augusta-Richmond Cnty., 501 F.3d 1244, 1251 (11th Cir. 2007). Generally, a court 

may consider any of the following in order to rule on a Rule 12(b)(1) motion: (1) the 
complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or 
(3) the complaint, undisputed facts, and the court’s resolution of disputed facts. 

7 Plaintiffs’ draftsmanship here leaves much to be desired. Though they eventually 
set out four claims, only three are mentioned in the Complaint’s seven paragraphs. 
(Doc. 1, p. 3, ¶ 7.) 
8 As the Court is disposing of the Motion under Rule 12(b)(1), the Court need not 
address the burden of proof or the Defendant’s alternative request for dismissal 
under Rule 12(b)(6). 
Butler v. Morgan, 562 F. App’x 832, 834 (11th Cir. 2014) (citing Williamson v. 
Tucker, 645 F.2d 404, 413 (5th Cir. 1981)9). 

However, when a complaint is challenged for lack of subject matter 
jurisdiction on its face, all material allegations in the complaint will be taken as true 
and construed in the light most favorable to the plaintiff. See McElmurray, 501 F.3d 

at 1251. As jurisdiction and standing are critical, the plaintiff, never the movant, 
always bears the burden of demonstrating both factors. See Morrison v. Allstate-
Indem. Co., 228 F.3d 1255, 1273 (11th Cir. 2000). 
IV. DISCUSSION 
Standing is an essential threshold question for all federal courts under Article 

III of the U.S. Constitution. United Food & Commer. Workers Union Local 751 v. 
Brown Grp., 517 U.S. 544, 551 (1996); Warth v. Seldin, 422 U.S. 490, 498 (1975). 
To establish standing, a plaintiff must show (1) an injury in fact, (2) a causal 

relationship between the injury and the challenged conduct, and (3) a likelihood that 
the injury will be redressed by a favorable decision. Lujan v. Defs. of Wildlife, 504 
U.S. 555, 560-61 (1992). The requisite “injury in fact” must be “concrete and 
particularized and actual or imminent,” not “conjectural” or “hypothetical,” and 

must also be “fairly traceable to the challenged action of the defendant.” Id. Further, 

9 See Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (adopting 
as binding precedent in the Eleventh Circuit, all decisions of the former Fifth Circuit 
announced prior to October 1, 1981). 
it must be “likely, as opposed to merely speculative, that the injury will be redressed 
by a favorable decision.”10 Id. at 561. 

“The plaintiff, as the party invoking federal jurisdiction, bears the burden of 
establishing these elements.” Spokeo, Inc. v. Robins, __U.S.__, 136 S. Ct. 1540, 
1547, (2016) (citing FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990)). “Where, as 

here, a case is at the pleading stage, the plaintiff must ‘clearly ... allege facts 
demonstrating’ each element.” Id. (quoting Warth, 422 U.S. at 518 (1975)). 
In applying this standing jurisprudence to data breach cases, the vast majority 
of federal courts have reached the same conclusion despite differing interpretations 

of the Supreme Court’s decision in Clapper v. Amnesty International USA, 568 U.S. 
398 (2013). In Clapper, which involved alleged electronic surveillance by the 
National Security Agency, the Court declared that a plaintiff alleging that it will 

suffer future injuries from a defendant’s allegedly improper conduct must show that 
such injuries are “certainly impending.” 568 U.S. at 416–18. 
Bound by Clapper’s logic, lower federal courts presented with “lost data” or 
potential identity theft cases in which there is no proof of actual misuse or fraud 

have held that plaintiffs lack standing to sue the party who failed to protect their 

10 “Prudential standing,” the non-constitutional doctrine which often goes hand in 
hand with constitutional standing analysis, does not apply in this case. See generally 
Warth, 422 U.S. at 499-500 (discussing prudential standing). 
data. E.g., In re: Cmty. Health Sys., Inc., No. 15-CV-222-KOB, 2016 WL 4732630, 
at *10 (N.D. Ala. Sept. 12, 2016) (Bowdre, J.) (“[F]or the Plaintiffs in the instant 

case who did not have allegations of misuse accompanying their claims of an 
increased risk of harm, the facts pled here do not meet the definition of injury-in-
fact; the alleged injuries are “conjectural and hypothetical” and are not “concrete,” 

nor are they “actual or imminent.”) (citing Lujan, 504 U.S. at 560-61); see id. at *9 
(noting that “the Eleventh Circuit has not chosen a side in this fray) (citing Resnick 
v. AvMed, Inc., 693 F.3d 1317, 1323 n.1 (11th Cir. 2012) (finding that the plaintiffs 
there “alleged only actual—not speculative—identify theft,” wherefore “we need 

not address the issue of whether speculative identity theft would be sufficient to 
confer standing.”) (emphasis added); Taylor v. Fred’s, Inc., 285 F. Supp. 3d 1247, 
1267 (N.D. Ala. 2018) (citing Clapper and holding against plaintiff in similar 

context based on defendant’s alleged violation of Fair and Accurate Credit 
Transactions Act of 2003 (“FACTA”)); see also Chambliss v. CareFirst, Inc., 189 
F. Supp. 3d 564, 571 (D. Md. 2016) (“Plaintiffs’ efforts to establish the imminence 
of their theory of harm are unpersuasive,” where plaintiff relied on cases which 

“either concerned information more easily used in fraudulent transactions or relied 
on factual allegations that the hackers had already misused the stolen data such that 
the risk of future harm was certainly impending”) (also collecting cases); Whalen v. 

Michael Stores Inc., 153 F. Supp. 3d 577, 580–81 (E.D.N.Y. 2015); In re 
Zappos.com, Inc., 108 F. Supp. 3d 949, 958–59 (D. Nev. 2015); Storm v. Paytime, 
Inc., 90 F. Supp. 3d 359, 365 (M.D. Pa. 2015); Strautins v. Trustwave Holdings, Inc., 

27 F. Supp. 3d 871, 876–77 (N.D. Ill. 2014); Green v. eBay Inc., No. CIV.A. 14-
1688, 2015 WL 2066531, at *6 (E.D. La. May 4, 2015); Peters v. St. Joseph Servs. 
Corp., 74 F. Supp. 3d 847, 854–56 (S.D. Tex. 2015); In re Sci. Applications Int'l 

Corp. (SAIC) Backup Tape Data Theft Litig., 45 F. Supp. 3d 14, 26–27 (D.D.C. 
2014) (discussing Clapper and also collecting pre-Clapper cases finding against 
plaintiffs in data breach cases where they alleged speculative harm); In re SuperValu, 
Inc., No. 14-MD-2586 ADM/TNL, 2016 WL 81792, at *4 (D. Minn. Jan. 7, 2016), 

aff'd in part, rev'd in part and remanded, 870 F.3d 763 (8th Cir. 2017) (collecting 
cases and concluding that this approach now constitutes the majority one among 
federal courts); Reilly v. Ceridian Corp., 664 F.3d 38, 42–43 (3d Cir. 2011) (pre-

Clapper case applying the same Article III injury logic to data breach case); but see 
In re 21st Century Oncology Customer Data Sec. Breach Litig., 380 F. Supp. 3d 
1243, 1250, 1251, n.5 (M.D. Fla. 2019) (stating that “(o)ther circuits, however, have 
addressed the question and have come to differing conclusions” and that there “is a 

comparable disarray among district courts.”). 
Other lower courts have disagreed, but even these more forgiving courts still 
require plaintiffs to allege a “credible threat.” In re Sony Gaming Networks & 

Customer Data Sec. Breach Litig., 996 F. Supp. 2d 953, 961-62 (S.D. Cal. 2014) 
(surveying case law and deriving rule for data breach cases in part from San Luis & 
Delta-Mendota Water Auth. v. U.S. Dep’t of Interior, 905 F. Supp. 2d 1158, 1170–

71 (E.D. Cal. 2012), and Doe 1 v. AOL, LLC, 719 F. Supp. 2d 1102, 1108–09 (N.D. 
Cal. 2010)); accord, e.g., Krottner v. Starbucks, 628 F.3d 1139, 1142-43 (9th Cir. 
2010); cf. Remijas v. Neiman Marcus Grp., LLC, 794 F.3d 688, 692–94 (7th Cir. 

2015); In re SuperValu, Inc., No. 14-MD-2586 ADM/TNL, 2016 WL 81792, at *6 
(collecting cases). 
Furthermore, the passage of months, and then, years, only renders any such 
conjectural threat increasingly less imminent. See Storm, 90 F. Supp. 3d at 367; In 

re Zappos.com, Inc., 108 F. Supp. 3d at 958. 
Notably, in 2012, the Eleventh Circuit accorded standing to plaintiffs in a data 
breach case; but there, the stolen data had been exploited to open bank and brokerage 

accounts in the unsuspecting plaintiffs’ names, causing actual monetary damages. 
Resnick v. AvMed, Inc., 693 F.3d 1317, 1322–23 (11th Cir. 2012). This approach has 
been followed by other courts in the circuit. E.g., In re 21st Century Oncology 
Customer Data Sec. Breach Litig., 380 F. Supp. 3d at 1250–56; Smith v. Triad of 

Alabama, LLC, No. 1:14-CV-324-WKW, 2015 WL 5793318, at *9 (M.D. Ala. Sept. 
29, 2015) (Watkins, J.). 
Taken together, the weight of authority shows that a plaintiff must provide at 

least some plausible specific allegation of actual or likely misuse of data to satisfy 
Article III’s standing requirement and avoid dismissal under Rule 12(b)(1), a 
position consistent even with pre-Clapper precedent. See, e.g., Burrows v. 

Purchasing Power, LLC, No. 1:12-CV-22800-UU, 2012 WL 9391827, at *2 (S.D. 
Fla. Oct. 18, 2012) (finding an injury in fact where plaintiff alleged that his identity 
was stolen when an unknown individual misused his PII to file a tax return and that 

he was denied tax refund); see also Krottner, 628 F.3d at 1142; In re Google, Inc. 
Privacy Policy Litig., No. C 12-01382 PSG, 2012 WL 6738343, at *6 (N.D. Cal. 
Dec. 28, 2012) (dismissing plaintiffs’ claims based on Google’s policy of retaining 
personal information for lack of Article III standing because there were no 

allegations plaintiffs’ personal information had been disseminated). In fact, “since 
Clapper . . . courts have been even more emphatic in rejecting increased risk as a 
theory of standing in data-breach cases.” In re Sci. Applications Int’l Corp. Backup 

Tape Data Theft Litig., 45 F. Supp. 3d at 28 (internal quotation marks omitted). 
Here, the fact that the Breach occurred cannot in and of itself be enough, in 
the absence of any imminent or likely misuse of protected data, to provide Plaintiffs 
with standing to sue. The Complaint lacks any allegations suggesting that any 

“disclosure” of their data, such as an actual review by a third party, has occurred; in 
fact, Plaintiffs fail to allege that they or members of the putative class have suffered 
actual identity theft. Instead, their pleading speaks of possibilities and traffics in 

maybes. (E.g., Doc. 1, pp. 3, 16.) 
The Notice upon whose basis the Plaintiffs sue, included as exhibits to their 
own pleading, denies that any personal information was copied, downloaded, or 

removed from the network, despite Plaintiffs’ mistaken belief to the contrary. (Doc. 
1-1 p. 2.) True enough, the Notices concede that “[t]he information potentially 
impacted may [have] include[d a patient’s] name, address, and health insurance 

number,” as well as, per one of the Notice letters, the patient’s Social Security 
Number and health treatment information, (see Doc. 1-2, p. 2), but, Sarrell’s 
investigation had not “discovered any evidence that the information that may be 
involved in this incident ha[d] been misused” between July and September 2019. 

(Doc. 1-1, p. 2; Doc. 1-2, p. 2; Doc. 1-3, p. 2; Doc. 1-4, p. 2; see also Doc. 21, p. 
16.) 
Unquestionably, “the possibility that the hacker [had] obtained sensitive 

information from the network” could not be discounted. (Doc. 1-1, p. 2; Doc. 1-2, p. 
2; Doc. 1-3, p. 2; Doc. 1-4, p. 2; see also Doc. 21, p. 16.) But the Notices do not 
say—and the Complaint does not allege—that the hackers both obtained and intend 
to expose the Plaintiffs’ specific personal data. 

If, per the Complaint, the allegation—which must be taken as fact—stating 
the “result of Defendant’s failure to implement and follow basic securities 
strategies” is that “Patient PII is now likely in the hands of thieves,” but no “evidence 

that the information that may be involved in this incident ha[d] been misused” has 
been found, and given that there is no more than the “possibility that the hackers 
obtained sensitive information,” which may include names, addresses, dates of birth, 

health insurance numbers, and in one case, a social security number and treatment 
information, despite the Plaintiffs’ insistence to the contrary, (Doc. 1-1, p. 2, 
(emphasis added)), Plaintiffs simply have failed to plausibly point to a certain threat 

of the hackers’ making use of their specific personal data as a result of the Breach. 
An account of other hacks and the potential uses to which hackers may put 
stolen data, the use of such buzzwords as “secret,” and even appeals to protect 
children and their privacy, cannot obscure the Plaintiffs’ failure to point to an injury 

both particularized and concrete, imminent and plausible.11 In the absence of an 
actuality or a likelihood, the mere possibility that the Plaintiffs’ PII may have been 
gathered and disseminated and that their credit may suffer if the hackers opt to sell 

or release this information to those able and willing to exploit it cannot impart the 
requisite standing.12 E.g., Clapper, 568 U.S. at 410. Other district courts within the 
Eleventh Circuit have held the same. See In re 21st Century Oncology Customer 
Data Sec. Breach Litig., 380 F. Supp. 3d at 1250–56; I Tan Tsao v. Captiva MVP 

11 The Plaintiffs’ claim that they suffered money damages because they paid for 
services at Sarrell but would not have done so had they known that Sarrell would get 
hacked later on, is pure applesauce. 
12 In this regard, this Court finds Plaintiffs’ extended riff on the court’s obligation to 
protect this nation’s children both overdrawn and inapposite. No amount of purple 
prose can provide a person without a cognizable injury the standing to sue. 
Rest. Partners, LLC, No. 8:18-CV-1606-T-02SPF, 2018 WL 5717479, at *2 (M.D. 
Fla. Nov. 1, 2018); Provost v. Aptos, Inc., No. 1:17-CV-02120-ELR, 2018 WL 

1465766, at *3 (N.D. Ga. Mar. 12, 2018); Torres v. Wendy's Co.,195 F. Supp. 3d 
1278, 1283 (M.D. Fla. 2016); Smith, 2015 WL 5793318, at *7; see also Reilly, 664 
F.3d at 44-45; Khan v. Children’s Nat’l Health Sys., 188 F. Supp. 3d 524, 532–33 

(D. Md. 2016); Key v. DSW, Inc., 454 F. Supp. 2d 684, 687–90 (S.D. Ohio 2006). 
This wide array of authority leaves the Plaintiffs with but the slenderest of 
reeds upon which to rest their standing argument: that of their alleged money 
damages. Yet even here, the Plaintiffs’ actual incurred costs to address the data 

breach are insufficient to demonstrate standing. 
As another district court in this circuit found, data breach mitigation costs do 
not create an Article III injury for plaintiffs who allege speculative harms resulting 

from the poaching of their personal data. 21st Century Oncology, 380 F. Supp. 3d at 
1256) (“where the risk of identity theft is too speculative to constitute an injury in 
fact, the alleged injury of mitigation efforts to minimize that risk is likewise typically 
found to be non-cognizable.”) (citing In re SuperValu, 870 F.3d at 771) (“Because 

plaintiffs have not alleged a substantial risk of future identity theft, the time they 
spent protecting themselves against this speculative threat cannot create an injury.”); 
see Clapper, 568 U.S. at 416 (“Thus, allowing respondents to bring this action based 

on costs they incurred in response to a speculative threat would be tantamount to 
accepting a repackaged version of respondents' first failed theory of standing.”).13 
The same principle applies here, and the Plaintiffs’ alleged monetary damages are 

thus insufficient to provide them Article III standing. See, cf. Resnick, 693 F.3d at 
1322 (one plaintiff’s sensitive information was used by an unknown third party to 
open Bank of America accounts and to activate credit cards which were used to make 

unauthorized purchases and to open an account with E*Trade Financial, which was 
later overdrawn). 
So in the end, without more, the Complaint must be dismissed for Plaintiffs’ 
lack of standing. See Stapleton on behalf of C.P. v. Tampa Bay Surgery Ctr., Inc., 

No. 8:17-CV-1540-T-30AEP, 2017 WL 3732102, at *3 (M.D. Fla. Aug. 30, 2017) 
(“Plaintiffs allegations rely on a chain of inferences that is too attenuated to 
constitute imminent harm.”); see also In re iPhone Application Litig., No. 11-MD-

02250-LHK, 2011 WL 4403963, at *4-7 (N.D. Cal. Sept. 20, 2011) (no standing in 
a data breach case because plaintiffs had not alleged any “particularized example” 
of economic injury or harm to their computers, but instead offered only abstract 

13 The Seventh Circuit also addressed this issue in Remijas, 794 F.3d at 694, 
explaining that “(m)itigation expenses do not qualify as actual injuries where the 
harm is not imminent.” (citing Clapper, 568 U.S. at 414) (concluding that “costs that 
they have incurred to avoid [injury]” are insufficient to confer standing). “Plaintiffs 
‘cannot manufacture standing by incurring costs in anticipation of non-imminent 
harm.’” Id. “If the law were otherwise, an enterprising plaintiff would be able to 
secure a lower standard for Article III standing simply by making an expenditure 
based on a nonparanoid fear.” Id. 
concepts, such as “opportunity costs,” “value-for-value exchanges,” “consumer 
choice,” and “diminished performance”). 

V. CONCLUSION 
Based on the foregoing, it be and is hereby 
ORDERED as follows: 
(1) To the extent the Defendant seeks dismissal pursuant to Rule 12(b)(1), the 
 Defendant’s Motion to Dismiss (Doc. 21) is GRANTED; 

(2) This case is DISMISSED without prejudice. 
A separate judgment shall issue. 
DONE, this 16th day of July, 2020. 

 /s/ R. Austin Huffaker, Jr. 
 R. AUSTIN HUFFAKER, JR. 
 UNITED STATES DISTRICT JUDGE