# United States Court of Appeals
### For the Eighth Circuit

_____

No. 21-3013
_____

State of Missouri, et al.

*Plaintiffs - Appellants*

v.

Joseph R. Biden, Jr., in his official capacity as
the President of the United States of America, et al.

*Defendants - Appellees*

------------------------------

Committee for a Constructive Tomorrow

*Amicus on Behalf of Appellants*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: June 16, 2022
Filed: October 21, 2022

_____

Before LOKEN and KELLY, Circuit Judges, and MENENDEZ, District Judge.[*]

_____

---

[*]The Honorable Katherine M. Mendendez, United States District Judge for the District of Minnesota, sitting by designation.

LOKEN, Circuit Judge.

Upon taking office, President Joseph Biden issued Executive Order 13990 ("E.O. 13990"), entitled "Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis," and invoking "the authority vested in me as President by the Constitution and the laws of the United States of America." 86 Fed. Reg. 7037 (Jan. 20, 2021). E.O. 13990 expressly revoked or suspended numerous Executive Orders issued by his predecessor, President Donald Trump. See id. at 7041-42. The revoked orders included Executive Order 13783 ("E.O. 13783"), in which President Trump disbanded an Interagency Working Group on the Social Cost of Greenhouse Gases ("IWG") established by President Barack Obama. 82 Fed. Reg. 16093, 16095-96 (Mar. 28, 2017). E.O. 13990 re-established the IWG with members from multiple cabinet-level and executive branch agencies,[1] directed the IWG to publish interim and then final estimates of the social costs of greenhouse gas emissions (hereafter, "interim SC-GHG estimates"), and required federal agencies to use these estimates when monetizing the costs and benefits of future agency actions and regulations. 86 Fed. Reg. at 7040-41.

The IWG published interim SC-GHG estimates in February 2021; final estimates have not yet been published. The State of Missouri and twelve other States[2] then filed this action against President Biden, the IWG, numerous federal officials,

---

[1]The IWG is co-chaired by the Chair of the Council of Economic Advisers, the Director of the Office of Management and Budget (OMB), and the Director of the Office of Science and Technology Policy. It includes the Secretaries of the Treasury, the Interior, Agriculture, Commerce, Health and Human Services, Transportation, and Energy; the Chair of the Council on Environmental Quality; the Administrator of the Environmental Protection Agency; the Assistant to the President and National Climate Advisor; and the Assistant to the President for Economic Policy and Director of the National Economic Council, or their designees. 86 Fed. Reg. at 7040.

[2]Alaska, Arizona, Arkansas, Indiana, Kansas, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, and Utah.

departments, and agencies. In their March 26, 2021, First Amended Complaint, the States requested injunctive and declaratory relief, asserting four causes of action: (1) "Violation of the Separation of Powers;" (2) "Violation of Agency Statutes;" (3) "Procedural Violation of the APA"; and (4) "Substantive Violation of the APA." The States moved for a preliminary injunction prohibiting "defendants, except for the President, from using the [interim SC-GHG estimates] as binding values in any agency action." The Defendants moved to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim under Rule 12(b)(6), arguing that the States lack Article III standing, and that their challenges to the interim SC-GHG estimates are not ripe for adjudication and are meritless. The district court[3] concluded the States lack Article III standing and their claims are not ripe for adjudication, granted Defendants' motion to dismiss for lack of subject matter jurisdiction, and denied Plaintiffs' motion for a preliminary injunction as moot. Missouri v. Biden, 558 F. Supp. 3d 754 (E.D. Mo. 2021).[4]

The Plaintiff States appeal, arguing they have Article III standing, their claims are ripe for adjudication, and we should remand with directions to enter the requested preliminary injunction. We review the issues of Article III standing and ripeness *de novo*. Missouri v. Yellen, 39 F.4th 1063, 1067 (8th Cir. 2022). We conclude that the States are requesting a federal court to grant injunctive relief that directs "the current administration to comply with prior administrations' policies on regulatory analysis [without] a specific agency action to review," a request that is "outside the authority of the federal courts" under Article III of the Constitution. Louisiana by & through

_____

[3]The Honorable Audrey G. Fleissig, United States District Judge for the Eastern District of Missouri.

[4]The district court did not reach Defendants' contention that the States' claims are without merit, and neither do we. With respect to future challenges to the merits of the SC-GHG estimates, the dismissal is without prejudice, like the Rule 12(b)(1) dismissal in Yeransian v. B. Riley FBR, Inc., 984 F.3d 633, 636 (8th Cir. 2021).

Landry v. Biden, No. 22-30087, 2022 WL 866282, at *3 (5th Cir. Mar. 16), appeal to vacate denied, 142 S. Ct. 2750 (May 26, 2022).  Accordingly, we affirm.

## I. Background

Dating back at least to President Richard Nixon's administration, Presidents have instituted procedures coordinating federal agency actions, and, of particular relevance here, requiring agencies to engage in quantified cost-benefit analyses before imposing or adjusting regulatory burdens.  Article II, Section 1 of the Constitution vests "executive Power" in the President.  It is not a shared power.  The President and his White House staff have a "basic need . . . to monitor the consistency of executive agency regulations with Administration policy."  Subject of course to statutory limits and directives, this need demands the creation of interagency working groups or teams whose purposes are to advise the President on policy questions that affect numerous agencies, and to communicate to those agencies the policies the President adopts for his administration.  See, e.g., Sierra Club v. Costle, 657 F.2d 298, 405-06 & n.524 (D.C. Cir. 1981).  Thus, we reject the States' broad contention that the IWG's SC-GHG estimates are invalid because the IWG possesses "no delegation of any legislative authority" by Congress.  The IWG was formed by the President to communicate his policies to agencies in exercising *their* delegated legislative authority.  We may not prohibit this sensible exercise of the President's executive power.

The policies here at issue affect the manner in which agencies engage in quantified cost-benefit analysis before adopting regulations or implementing agency actions, an analysis that is now universally recognized as critical to the proper exercise of executive power. See, e.g., Meyer v. Bush, 981 F.2d 1288, 1298 (D.C. Cir. 1993) (President Reagan's Task Force on Regulatory Relief); Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993); Off. of Mgmt. & Budget ("OMB"), Exec. Off. of the President, OMB Circular A-4, at 1, 27 (Sept. 17, 2003).  As the

history of EO 13990 makes clear, this type of analysis raises complex, controversial issues that trigger intense political, economic, and environmental disagreement. But absent a specific controversy that falls within the judiciary's Article III power to decide Cases and Controversies, these policy disagreements are for the people to decide through their elected representatives in the legislative and executive branches of government. See TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203 (2021).

As the focus on climate change intensified in recent decades, Executive Branch cost-benefit analyses began incorporating the direct and indirect effects of greenhouse gas emissions caused by agency actions. To ensure interagency consistency, President Obama in 2010 established the first IWG to define a standard estimate for the social cost of carbon. See IWG, Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 (Feb. 2010). The initial estimates were revised and republished after an Administrative Procedure Act ("APA") notice and comment period. See IWG, Response to Comments: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 (July 2015). Estimates for methane and nitrous oxide were added in 2016.[5]

In E.O. 13783, President Trump disbanded the IWG and set aside its SC-GHG estimates. E.O. 13783 allowed agencies to continue to use their own SC-GHG estimates in a manner consistent with general processes for agency cost-benefit analysis. See 82 Fed. Reg. at 16095-96. In E.O. 13990, President Biden established a reconstituted IWG and directed it to publish interim and final SC-CHG estimates "as appropriate and consistent with applicable law." The IWG's interim SC-GHG estimates, published on February 26, 2021, were the same as the Obama IWG's estimates, adjusted for inflation. See IWG, Technical Support Document: Social Cost

---

[5]See IWG, Addendum to Technical Support Document on Social Cost of Carbon for Regulatory Impact Analysis under Executive Order 12866: Application of the Methodology to Estimate the Social Cost of Methane and the Social Cost of Nitrous Oxide (Aug. 2016).

of Carbon, Methane, and Nitrous Oxide Interim SC-GHG estimates under Executive Order 13990 (Feb. 2021).

After this suit was filed but before the district court ruled on the parties' cross motions, the OMB opened a notice and comment period on the interim SC-GHG estimates and on strategies for incorporating contemporary science and economics research in defining the final estimates. OMB, Notice of Availability and Request for Comment on "Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim SC-GHG estimates Under E.O. 13990", 86 Fed. Reg. 24669 (May 7, 2021). In June 2021, the Office of Information and Regulatory Affairs ("OIRA") published a document clarifying that agencies must use the IWG's interim SC-GHG estimates in complying with the general cost-benefit analysis principles adopted in Executive Order 12866 and applicable statutes. OIRA, Social Cost of Greenhouse Gas Emissions: Frequently Asked Questions (FAQs) (June 3, 2021).

## II. The Plaintiff States Lack Article III Standing

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). It "serves to prevent the judicial process from being used to usurp the powers of the political branches." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013). The "irreducible constitutional minimum of standing" requires plaintiffs to show they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, 578 U.S. at 338 (quotation and citations omitted). To avoid dismissal for lack of standing, the States, like private plaintiffs, "must allege sufficient facts to support a reasonable inference that they can satisfy the elements of standing." Yellen, 39 F.4th at 1068 (quotation omitted). The "standing inquiry [is] especially rigorous when reaching the merits of the dispute would force us to decide whether an action

taken by one of the other two branches of the Federal Government was unconstitutional." Clapper, 568 U.S. at 408 (quotation omitted).

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Spokeo, 578 U.S. at 339 (quotations omitted). The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." Clapper, 568 U.S. at 409 (emphasis in original) (cleaned up). In their First Amended Complaint, the States allege a host of economic, sovereign, and procedural injuries.

(1) Although their principal focus is elsewhere, the States allege that direct monetary injury will result from federal agencies' future use of the interim SC-GHG estimates. They argue the estimates' emphasis on the "social benefits" of increased restriction of greenhouse gas emissions will result in "costs to states as purchasers of more heavily regulated goods and services," and "loss of future tax revenues" from more heavily regulated economic activity. Economic injury to a State from increased proprietary costs or reduced tax revenues can certainly be sufficiently "concrete and particularized" to give the State standing to sue, provided the threatened injury is "certainly impending" and "fairly traceable" to the challenged conduct. Cf. Dep't. of Commerce v. New York, 139 S. Ct. 2551, 2565 (2019). So why do these alleged injuries not suffice to avoid a motion to dismiss for lack of standing in this case?

The problem with this contention, as the district court explained, is that the alleged economic injuries are "concrete" only if we "assume that at some point in the future, one or more agencies will 'inevitably' issue one or more regulations that rely in some way upon the Interim Estimates; that such agency will 'inevitably' disregard any objections to the methodology by which the Interim SC-GHG estimates were calculated; and that this yet-to-be-identified regulation will then harm Plaintiffs in a

-7-

concrete and particularized way." 558 F. Supp. 3d at 765. This theory of injury in fact "does not satisfy the requirement that threatened injury must be certainly impending" because it "relies on a highly attenuated chain of possibilities." Clapper, 568 U.S. at 410, citing Summers v. Earth Island Inst., 555 U.S. 488, 496 (2009).

In Summers, the Court dismissed for lack of standing plaintiffs' challenge to the United States Forest Service's exemption of certain timber sales from notice and comment rule-making. Without injury allegations tied to a specific logging project, the Court concluded, the mere statistical likelihood that the regulations would harm the plaintiffs in the future was insufficient. 555 U.S. at 498. The challenged Forest Service procedures "neither require nor forbid any action on the part of respondents. . . . [They] govern only the conduct of Forest Service officials engaged in project planning." Id. at 493. Similarly here, even if E.O. 13990 makes their use mandatory, the interim SC-GHG estimates only establish a consistent standard for one factor federal agencies *may* use when conducting cost-benefit analyses they are obligated to complete under executive branch regulations and statutory directives. We agree with the district court that the "Interim SC-GHG estimates, alone, do not injure Plaintiffs. . . . The injury that Plaintiffs fear is from hypothetical future regulation possibly derived from these Estimates." 558 F. Supp. 3d at 766.

The government's brief aptly summarizes the estimates' limited impact: "*if* agencies propose future regulations, *if* they conduct cost-benefit analyses for those regulations, and *if* they choose to monetize GHG emissions in those analyses, then the agencies must use the Interim SC-GHG estimates." This highly attenuated theory of injury does not satisfy the States' burden to show the requisite causation. "For causation to exist, the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Agred Found. v. U.S. Army Corps of Engr's, 3 F.4th 1069, 1073 (8th Cir. 2021) (quotation omitted). In these circumstances, even if the States plausibly allege

concrete injury, they fail to show the alleged injuries are caused by the interim SC-GHG estimates.

(2)  On appeal, the States argue the district court also erred by failing to take into account the past and ongoing *sovereign* injury caused by the interim SC-GHG estimates' intrusion into the States' role as regulators in cooperative federalism programs such as those mandated by the National Environmental Policy Act (NEPA), Clean Air Act state implementation plans, and federal highway administration actions.  They argue this injury -- "depriv[ing] the States of freedom and discretion that they otherwise would have had in administering these programs" -- "does not depend on the impact of a future agency action, because it immediately affects how States participate in formulating agency actions."

Whether and when alleged sovereign injuries can constitute the concrete and particularized injury in fact required for Article III standing is a controversial, unsettled question, as the Supreme Court's 5 to 4 decision in Massachusetts v. EPA, 549 U.S. 497 (2007), makes clear.  However, even if the States as sovereigns are entitled to some undefined "special solicitude" in the standing analysis, they still must satisfy the basic requirements of Article III standing.  Yellen, 39 F.4th at 1070 n.7, citing Massachusetts v. EPA, 549 U.S. at 521-23.

E.O. 13990 explicitly states that the interim SC-GHG estimates apply only to federal  "executive departments and agencies."  86 Fed. Reg. at 7037.  "[W]here a causal relation between injury and challenged action depends on the decision of an independent third party [here, future regulatory decisions of other federal agencies] standing is not precluded but it is ordinarily substantially more difficult to establish." California v. Texas, 141 S. Ct. 2104, 2117 (2021) (cleaned up).  Here, neither the interim SC-GHG estimates nor EO 13990 impose obligations on the States.  Even when States are conducting cost-benefit analyses as part of their participation in cooperative federalism programs, they are not bound to use the interim SC-GHG

estimates. The States would prefer that their federal agency partners not use these estimates in future program planning or decision-making. But that is not concrete harm to the States. "No concrete harm, no standing." Transunion, 141 S. Ct. at 2200.

(3) The States further argue the district court erred in concluding "that Article III standing could never exist until a future agency action based on the [interim SC-GHG estimates] is finalized." They cite Bennett v. Spear, 520 U.S. 154 (1997), as controlling contrary authority. In Bennett, ranchers and irrigation districts challenged a Fish and Wildlife Service "biological opinion" issued under the Endangered Species Act. The Supreme Court reversed the dismissal of their action for lack of standing. Though plaintiffs' threatened injury -- allocation of less water under the Klamath Irrigation Project -- would be caused by a third party, the Bureau of Reclamation, the Court held that plaintiffs met their "relatively modest" burden of alleging injury that is "fairly traceable" to the biological opinion because that opinion "has a powerful coercive effect on the action agency," "alters the legal regime to which the action agency is subject," and has a "virtually determinative effect" on agency action that will result in concrete and particularized harm to the plaintiffs. Id. at 169-71. The district court distinguished Bennett because "neither EO 13990 nor the Interim SC-GHG estimates mandate agencies issue the particular regulations that Plaintiffs fear will harm them." 558 F. Supp. 3d at 767. We agree.

The facts alleged here are materially different than in Bennett. The States seek injunctive relief against all future uses of the interim SC-GHG estimates; the Court in Bennett addressed a concrete dispute about a pending agency action affecting a specific irrigation project. Moreover, unlike the biological opinion's "virtually determinative effect" on specific agency action in Bennett, the interim SC-GHG estimates are only "one of innumerable other factors in the cost-benefit analysis conducted by a wide range of agencies in an even wider range of regulatory contexts, and only to the extent consistent with applicable law." 558 F. Supp. 3d at 767. We agree with the Fifth Circuit that these alleged future increased regulatory costs are not

-10-

traceable to the interim SC-GHG estimates "because agencies consider a great number of other factors in determining when, what, and how to regulate or take agency action (and the Plaintiff States do not challenge a *specific* regulation or action)." Louisiana v. Biden, 2022 WL 866282, at *2 (emphasis in original).

(4) Finally, the States argue they suffered procedural harm when the IWG published initial estimates without APA notice and comment procedures. They assert this injury alone gives them Article III standing, pointing to our decision in Iowa League of Cities v. EPA, 711 F.3d 844, 870-71 (8th Cir. 2013). We reject this contention for two independent reasons.

First, the Supreme Court has held that the "deprivation of a procedural right without some concrete interest that is affected by the deprivation -- a procedural right *in vacuo* -- is insufficient to create Article III standing." Summers, 555 U.S. at 496. In Iowa League of Cities, we held that we had subject matter jurisdiction to review an APA procedural challenge to agency "guidance letters" responding to a Senator's inquiries because the letters were binding policy promulgations that threatened the plaintiffs's concrete interest "in avoiding regulatory obligations above and beyond those that can be statutorily imposed upon them." 711 F.3d at 871. Here, the alleged procedural harm is untethered to any specific harm. By challenging all uses of the interim SC-GHG estimates, rather than their use in a specific agency action, the States are asserting only "a procedural right *in vacuo*."

Second, the States assert that the IWG is an "agency" subject to APA notice and comment requirements. But in support, they cite only Soucie v. David, 448 F.2d 1067, 1075 (D.C. Cir. 1971), a case holding that the Office of Science and Technology, an entity within the Executive Office of the President, was an "agency" subject to the disclosure requirements of the Freedom of Information Act (FOIA), which is part of the APA. Congress approved this decision when it amended the definition of "agency" in the section of the APA that imposes FOIA requirements to

-11-

include "the Executive Office of the President."  5 U.S.C. § 552(f)(1) (formerly § 552(e)); see Meyer, 981 F.2d at 1291-92.  But the APA's rule-making requirements, 5 U.S.C. § 553, apply to an "agency" as generally defined in 5 U.S.C. § 551(1) -- "each authority of the Government of the United States."  The Supreme Court has never held that the President's interagency working groups are § 551(1) "agencies" and therefore their "actions" are subject to APA notice and comment requirements. We doubt it would do so, because such a ruling would encourage constant judicial interference with the President's exercise of his executive power.  Cf. Kissinger v. Reporters Comm., 445 U.S. 136, 155-58 (1980).  We certainly will not be the first to make this extraordinary leap.  For this reason, too, the States have failed to allege plausible procedural injury in fact.

The States failed to allege plausible injury in fact fairly traceable to the interim SC-GHG estimates.  Thus, their complaint was properly dismissed for lack of subject matter jurisdiction, specifically, lack of Article III standing.  We need not consider the third indispensable element of Article III standing, that it be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (quotations omitted).

## III. Conclusion

The Plaintiff States failed to plausibly allege the "irreducible constitutional minimum" of Article III standing -- concrete and particularized actual injury in fact that is fairly traceable to defendants' challenged conduct, publication of the interim SC-GHG estimates.  The Plaintiff States disagree with the President's policies reflected in the interim SC-GHG estimates, but it is not our role to "exercise general legal oversight of the Legislative and Executive Branches."  TransUnion, 141 S. Ct. at 2203.  When executive agencies or officials take or propose to take specific actions based on reliance on the interim SC-GHG estimates, E.O. 13990 does not exempt them from complying with statutory duties imposed by the APA, including providing

-12-

opportunities for notice and comment. And if the States believe that specific agency actions justified by the interim SC-GHG estimates inflict concrete and particularized injury, they may challenge the actions, and the interim SC-GHG estimates themselves, in federal court. See 5 U.S.C. § 706. But the States' "generalized grievance of how the current administration is considering SC-GHG. . . . fails to meet the standards of Article III standing." Louisiana v. Biden, 2022 WL 866282, at *2.

The judgment of the district court is affirmed.

_____